STATE OF NORTH CAROLINA v. BOBBY SCOTT JOHNSON

No. 266A93

(Filed 29 July 1994)

1. **Robbery § 118 (NCI4th)— armed robbery—dangerous weapon—lug wrench**

The trial court did not err in an armed robbery prosecution by denying defendant's request for an instruction on common-law robbery where the victim testified that he was awakened by a man holding what appeared to be a crowbar and threatening to kill him and other evidence showed that the man was defendant and that he possessed a lug wrench. Given the nature of the instrument and defendant's threat to kill the victim, the lug wrench was a deadly weapon. N.C.G.S. § 14-87(a).

**Am Jur 2d, Robbery §§ 71 et seq.**

2. **Robbery § 18 (NCI4th)— armed robbery—no instruction on common law robbery—victim's life threatened**

The trial court did not err in failing to instruct on common-law robbery in an armed robbery prosecution where defendant argued that there was no evidence that anyone threatened the life of Mrs. Ross, but the State's evidence showed clearly that three robbers planned to subdue Mr. and Mrs. Ross; defendant forced Mr. Ross into a room with Mrs. Ross; Mr. Ross was struck on the head with the lug wrench when he attempted to get up and help his wife; this blow with the lug wrench to her husband in Mrs. Ross' presence constituted a threat to her; the uncontradicted evidence also showed that when defendant and Debbie entered the trailer, Debbie, who subdued Mrs. Ross, carried a pry bar, and Mrs. Ross started screaming almost immediately; a pry bar could be used to inflict a deadly blow; and, in the hands of a middle-of-the-night intruder, a pry bar would be perceived by a four-foot, eleven-inch-tall woman as a dangerous, life-threatening weapon.

**Am Jur 2d, Robbery § 9.**

3. **Kidnapping § 18 (NCI4th)— accompanying armed robbery—restraint not inherent in robbery**

The trial court did not err by refusing to dismiss two kidnapping charges where there was ample evidence of restraint not inherent in the armed robbery in that the State's evidence showed

STATE v. JOHNSON

[337 N.C. 212 (1994)]

that defendant threatened to kill Mr. Ross with a lug wrench while an accomplice, a heavy woman, jumped on Mrs. Ross' chest, thereby restraining her, and covered Mrs. Ross' mouth and nose; defendant next forcibly removed Mr. Ross from his bedroom to the living room sofa, then called another accomplice in, handed her the lug wrench, and instructed her to guard Mr. Ross; that accomplice observed that Mr. Ross' hands had been taped together; defendant next bound Mrs. Ross' hands and feet; Mr. Ross attempted to get up and help Mrs. Ross after she fell silent, but someone struck him on the head with the lug wrench; and his hands and feet were thereafter tied. All the restraint necessary and inherent to the armed robbery was exercised by defendant's threatening Mr. Ross with the lug wrench; when defendant removed Mr. Ross to the living room, where he was struck and then tied up, Mr. Ross was exposed to a greater danger than that inherent in the armed robbery itself. Further, in light of Mrs. Ross' physical condition, the multiple restraints actually used on her exposed her to greater danger, even death, than that inherent in the armed robbery.

**Am Jur 2d, Abduction and Kidnapping § 32.**

**Seizure of detention for purpose of committing rape, robbery, or similar offense as constituting separate crime of kidnapping. 43 ALR3d 699.**

4. **Evidence and Witnesses § 755 (NCI4th)— burglary, kidnapping, robbery—defendant's prior bad acts—same evidence admitted in other testimony**

Any error in admitting evidence in a prosecution for burglary, kidnapping and robbery about defendant having previously stolen checks could not have been prejudicial where defendant had just elicited the same evidence.

**Am Jur 2d, Appeal and Error § 806.**

5. **Conspiracy § 43 (NCI4th)— instructions—not limited to those people named in indictment—no error**

The trial court did not commit plain error by instructing the jury that it could find defendant guilty of conspiracy without limiting the conspiracy to those people named in the indictment where both of the people named in the indictment testified for the State; each corroborated the other in the details of their

testimony; and no evidence showed that defendant conspired with other persons.

**Am Jur 2d, Conspiracy §§ 16, 28, 29.**

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from judgment imposing a sentence of life imprisonment entered by Strickland, J., at the 8 March 1993 Criminal Session of Superior Court, Onslow County, upon a jury verdict of guilty of first-degree murder. Defendant's motion to bypass the Court of Appeals as to additional judgments imposed for first-degree burglary, first-degree kidnapping, second-degree kidnapping, robbery with a dangerous weapon, and conspiracy was granted 15 November 1993. Heard in the Supreme Court 12 May 1994.

*Michael F. Easley, Attorney General, by Dennis P. Myers, Assistant Attorney General, for the State.*

*Nora Henry Hargrove for defendant-appellant.*

PARKER, Justice.

Defendant was indicted on charges of murder, first-degree burglary, first-degree kidnapping, second-degree kidnapping, two counts of robbery with a dangerous weapon, and conspiracy to commit first-degree burglary. He pleaded not guilty, was tried noncapitally, and was found guilty of all charges. The trial court sentenced defendant to life imprisonment for the first-degree murder conviction, which was based on felony murder. As to the other crimes, pursuant to N.C.G.S. § 15A-1340.4(a)(1)o the court found defendant had a prior conviction or convictions for criminal offenses punishable by more than sixty days' imprisonment. Finding no mitigating factors existed, the court imposed maximum consecutive sentences totalling 170 years. On 26 April 1993, the trial court granted defendant's motion for appropriate relief; arrested judgment on his conviction for first-degree burglary, the predicate for defendant's felony-murder conviction; and made the sentence for first-degree kidnapping consecutive to the life sentence for murder. For reasons which follow, we conclude defendant received a fair trial free of prejudicial error.

State's evidence tended to show that in the summer of 1992 Ida Ross and her husband, Wilbur, had been married for thirty years. They lived in a house trailer at 105 Ladd Street, Jacksonville, North Carolina. Mrs. Ross was four feet, eleven inches tall and overweight.

She suffered from diabetes, hypertension, hiatal hernia, and bronchitis. She slept on a hospital bed in the living room, and her husband slept in a bedroom at the back of the trailer.

In the same town, several young adults and infants were residing in, staying temporarily in, or visiting a house at 1401 Davis Street. The house was rented in the name of Robert Eric Hill, who resided there. His sister, Rachel Hill, also had a room there with her boyfriend, Philip Trackey, and their two-month-old child. Another Hill sibling, Rebecca ("Becky"), also resided there with her baby. In addition, Deborah Hemmert ("Debbie") had a room there, and her three-year-old son visited or stayed there occasionally. Defendant also had a room at 1401 Davis Street. His pregnant girlfriend, Melanie Walters, moved in with him in August 1992. Melanie worked at Sears, Trackey was a cab driver, and Robert Eric Hill worked at a fish market. The other adults were unemployed. Melanie was the only one of the group who owned an automobile.

Prior to moving in with defendant, Melanie lived with a girlfriend at 402 Dogwood Lane, Jacksonville. Around 1 August, there was a party at the Dogwood Lane residence. Becky Hill testified that she, defendant, and Debbie were in the living room drinking. Defendant said he needed to "do a lick" to make some money, and Becky understood this meant to commit a robbery. Defendant asked Becky if she knew any good licks where there would be a lot of cash. Becky replied that she knew a lady, Ida Ross, who usually kept at least $1000 in cash. Becky's grandmother rented a trailer from Mrs. Ross, and Becky knew Mrs. Ross had money and jewelry. Becky told defendant, "[I]t wouldn't be a real good lick to make when they're home." However, defendant said, "[W]e could go with him and tie them up and everything and take the money, and he asked me if I would do it with him, and at first I said no and then later on I agreed." As the evening progressed, defendant repeatedly asked Becky to help with the robbery and she finally agreed. Although Debbie was present during the conversation, she did not participate in it.

A few days later, Becky went with her baby to Ida Ross' trailer to meet Becky's grandmother. Becky arrived late; her grandmother was not there. Mrs. Ross invited Becky to stay for supper; and when Becky returned to Davis Street, she told defendant where she had been. Defendant said that they "needed to make that lick soon." On Friday, 7 August, Becky returned to the Rosses' trailer because she thought her baby had dropped a pacifier there. Debbie was with

Becky, and the two women went inside. They did not find the pacifier and left in order to pick Melanie up from work.

The three women then drove to the Davis Street house. Melanie went to sleep, but Becky drew a diagram of the Rosses' trailer. Debbie helped her label the rooms. As they were working, defendant walked through the room and saw them. Becky told defendant what she and Debbie were doing. Defendant said that they "needed to go ahead and make that lick soon."

Later that evening the residents of 1401 Davis Street had a cookout. While defendant was outside grilling food, Becky and Debbie talked to him. They were drinking whiskey and smoking crack cocaine. Defendant said he wanted to make the lick that night. He wanted Debbie to go along because Becky was not strong enough to hold anyone. The three discussed how to carry out the robbery. They agreed that they would need disguises. Becky said that near the Rosses' trailer was a clearing where they could park. Debbie said that she had some Halloween makeup and they could use it to blacken their faces. Defendant said they should portray themselves as blacks and put panty hose over their heads and bandannas over their faces. Becky and Debbie were not to speak aloud, defendant would do all the talking, and he would use dialect in order to sound like a black person. Defendant also said he knew Melanie had some rubber medical gloves, and they should wear them to avoid leaving fingerprints. Further, they should wear dark clothes. They agreed to don their disguises at the clearing so that no one at the Davis Street house would see them. They also agreed that defendant and Debbie would go in the back door of the trailer. Defendant would subdue Wilbur, Debbie would subdue Ida, and the victims would be tied up. Becky was to wait until defendant called her into the trailer.

Sometime around midnight either defendant or Rachel Hill woke Melanie up, and everyone ate supper. Defendant asked Melanie to go to the store for beer. Becky went with her, but first they went to Melanie's house so that Melanie could get some clothes. Becky found some of Melanie's knee-high stockings, went into the bathroom, tried to put them over her own face, and decided they were too tight. Becky also took a box of surgical gloves Melanie used in coloring hair and giving permanent waves. The two women then went to a convenience store, where they purchased beer and cigarettes. Becky also bought some panty hose.

Upon their return to Davis Street, Melanie began to help Rachel feed her baby. Defendant told Melanie he was going to use her car to take care of some business. Defendant told Rachel he was going to get some liquor and left. Becky and Debbie had already gone out the door, but no one saw them leave. About fifteen minutes later, Becky's baby started to cry. Rachel went through the house looking for Becky and became aware that neither she nor Debbie was there. Rachel and Melanie looked after the babies, and around 3:00 a.m., Philip Trackey came home from work. Soon after, Melanie, Rachel, and Philip went to bed.

In the meantime, defendant drove to the clearing near the Rosses' trailer. Becky and Debbie were with him, and as planned, all wore dark clothing. The two women blackened their faces, secured their hair, put panty hose over their heads, and tied bandannas around their lower faces. Defendant also put panty hose over his head and donned a bandanna. Becky put on two pairs of rubber gloves, and defendant and Debbie each put on three pairs. Defendant produced a lug wrench, a pry bar, a screwdriver, and some tape. He gave the pry bar to Debbie and the screwdriver to Becky but kept the lug wrench for himself.

The three went to the Rosses' trailer, where defendant and Debbie waited near the back door and Becky waited at the side of the trailer. Debbie walked over and told Becky they wanted to wait until the air conditioner, which was noisy, started up. Soon Becky heard the back door pop open, defendant and Debbie running in the house, and Mrs. Ross yelling. Although they had planned to use the tools to break into the house, the back door was not locked.

Mr. Ross was awakened by defendant's standing over him with what appeared to be a crowbar, yelling at him to get up. Defendant's face was blackened, and he wore a bandanna over his lower face. He called Mr. Ross "white trash," grabbed his arm, and began to push him down the hallway towards the living room of the trailer. In the meantime Debbie jumped on the bed, straddled Mrs. Ross, and sat on her chest. Debbie used her hand to cover Mrs. Ross' mouth. Mrs. Ross bit Debbie, and Debbie punched her in the face twice. Debbie saw defendant bring Mr. Ross into the living room and force him to sit on the sofa and heard defendant tell Mr. Ross to lie down. Defendant opened the front door and called for Becky to come into the trailer. However, following the plan, he addressed her as "Tyronne." Defendant handed Becky the lug wrench and told her to stand watch over Mr. Ross. Becky saw that Mr.

Ross' hands had been taped together. During this time, Mrs. Ross was still struggling and trying to scream. Defendant went towards the back of the trailer to get something with which to tie up the victims. Becky saw that defendant was using a small, shiny black flashlight. He returned, tied Mr. Ross up, and told Becky to keep watch out the window. With Debbie's help, defendant then tied up Mrs. Ross. He told Becky to remove Mrs. Ross' rings, and Becky did so. Defendant also told Becky to find Mrs. Ross' purse, and then he and Becky went through the purse and removed some money, credit cards, and jewelry.

Thereafter, Becky went into Mr. Ross' bedroom to find something to steal. Defendant came into the bedroom, and the two found and removed fifty dollars from Mr. Ross' wallet. Becky returned to the living room and noticed that Mrs. Ross had stopped making any noise. Mr. Ross testified that when his wife stopped yelling, he attempted to get up and help her; but someone hit him on the head with the crowbar. Other evidence introduced at trial showed he sustained a cut on his head. After being hit, Mr. Ross was forced facedown onto the sofa and his hands and feet were tied.

Still following the plan, Debbie whispered to Becky that Mrs. Ross had stopped moving, they needed to hurry up and get out, and Debbie did not know what was wrong. Becky went to defendant and told him they needed to hurry and leave. Defendant returned to the living room, observed that Mrs. Ross was motionless, put his hand on her neck to check her pulse, said he could feel her heart beating, and laid his head on her chest to see if she was still breathing.

The three robbers then gathered up items including a portable video camera, a small radio, and the aforementioned cash, credit cards, and jewelry and carried them to the car. On the way out of the trailer, Becky grabbed a towel and wet it in the sink. Back in the clearing, the three removed the panty hose and bandannas from their faces and used the towel to wash off the blacking. They put the panty hose, bandannas, and gloves in a pile in the backseat of the car, and defendant said he would throw them away. Defendant drove to Davis Street, where all the clothing worn in the robbery was given to Melanie to wash. Defendant sorted the stolen goods and buried or hid in the backyard those things he intended to keep, except for the cash, which he pocketed. He put the stolen goods which he did not intend to keep in a bag with the disguise materials, tied a weight to the bag, and threw it in the water at the Henderson Drive bridge.

Defendant and Becky then went to Court Street, where they used money from the robbery to buy crack cocaine. Next they stopped at a

convenience store to buy lighters and returned to Davis Street. For the rest of the night they remained awake, smoking the crack. Around first light, defendant left the house without Becky's knowledge.

In the meantime Mr. Ross was able to free himself and call for help. Jacksonville Police Officer Favius J. Howard arrived at the Rosses' trailer shortly after 4:00 a.m., observed Mr. Ross' injury, determined that Mrs. Ross was dead, and summoned other officers to the scene.

Sometime after daylight Becky's grandmother came to Davis Street with the news that Mrs. Ross had been murdered. Becky and Debbie were very frightened. Around noon, defendant, high on crack, returned to the house and learned that Mrs. Ross was dead. That night, he took the stolen video camera and radio, pry bar, and screwdriver to the Henderson Drive bridge. He smashed the camera and radio and scattered the pieces in the water. Then he drove to a grocery store in New River, where he threw the box of medical gloves into the trash. Later he instructed Becky to pack his clothes, and he left Jacksonville on 12 August. On 5 September 1992 he was apprehended in Searcy, Arkansas.

Expert medical testimony showed that the backs of Mrs. Ross' hands bore defensive wounds. Wounds to her face included a blackened right eye; lacerations across her nose; and lacerations of her lips, both on the outer and inner surfaces. Although a sock had been wrapped around her neck, lack of any external marks or internal injury indicated the ligature was not tightened. The cause of her death was suffocation owing to obstruction of her airways. Her nose and mouth had been closed off and her chest compressed by Debbie's sitting on her.

At the close of State's evidence defendant moved to dismiss all charges for insufficiency of evidence, and his motion was denied. Defendant offered no evidence.

[1] Defendant's first contention is that the trial court erred in denying his request for an instruction on common-law robbery. Defendant argues that State's evidence conflicted as to use of the pry bar, screwdriver, and lug wrench carried into the trailer by the assailants. Therefore, the jury could have determined that no deadly weapon was used to threaten or endanger the Rosses. We do not find defendant's arguments persuasive.

The applicable statute provides as follows:

> Any person or persons who, having in possession or with the use or threatened use of any firearms or other dangerous weapon, implement or means, whereby the life of a person is endangered or threatened, unlawfully takes or attempts to take personal property from another or from any place of business, residence or banking institution or any other place where there is a person or persons in attendance, at any time, either day or night, or who aids or abets any such person or persons in the commission of such crime, shall be guilty of a Class D felony.

N.C.G.S. § 14-87(a) (1993). Construing the predecessor of this statute, this Court said, "The critical difference between armed robbery and common law robbery is that the former is accomplished by the use or threatened use of a dangerous weapon whereby the life of a person is endangered or threatened." *State v. Peacock*, 313 N.C. 554, 562, 330 S.E.2d 190, 195 (1985). Further, "[w]hether an instrument can be considered a dangerous weapon depends upon the nature of the instrument, the manner in which defendant used it *or threatened to use it*, and in some cases the victim's perception of the instrument and its use." *Id.* at 563, 330 S.E.2d at 196 (emphasis added).

In the instant case, Mr. Ross testified that he was awakened by a man holding what appeared to be a crowbar and threatening to kill Mr. Ross. Other evidence showed the man was defendant; in reality he possessed a lug wrench. Under N.C.G.S. § 14-87(a) and *Peacock*, given the nature of the instrument and defendant's threat to kill Mr. Ross, the lug wrench was a deadly weapon. Therefore, defendant's argument that the jury could have determined no weapon was used to threaten Mr. Ross must fail.

[2] Defendant also argues that the trial court erred in failing to instruct on common-law robbery because there was no evidence that anyone threatened the life of Mrs. Ross. We do not find this argument persuasive. State's evidence showed clearly that the three robbers planned to subdue Mr. and Mrs. Ross. At the trailer, however, defendant forced Mr. Ross into the room with Mrs. Ross. Evidence showed that when Mr. Ross attempted to get up and help his wife, he was struck on the head with the lug wrench. This blow with the lug wrench to her husband in Mrs. Ross' presence constituted a threat to her as well. Further, the uncontradicted evidence also showed that when defendant and Debbie entered the trailer, Debbie, who subdued Mrs. Ross, carried a pry bar, and Mrs. Ross started screaming almost immediately. A pry bar could be used to inflict a deadly blow and, in

the hands of a middle-of-the-night intruder, would be perceived by a four-foot, eleven-inch-tall woman as a dangerous, life-threatening weapon.

> [W]here the uncontradicted evidence is positive and unequivocal as to each and every element of armed robbery, and there is no evidence supporting defendant's guilt of a lesser offense, the trial court does not err in failing to instruct the jury on the lesser included offense of common law robbery.

*Peacock*, 313 N.C. at 562, 330 S.E.2d at 195. In the present case uncontradicted evidence showed that both Mr. and Mrs. Ross were threatened with a deadly weapon; hence, we conclude the trial court did not err in failing to instruct on common-law robbery.

[3] Defendant's next contention is that the court erred in refusing to dismiss the charges of armed robbery and first-degree kidnapping of Mrs. Ross and second-degree kidnapping of Mr. Ross. As to the robbery of Mrs. Ross, defendant contends the evidence was insufficient to show use of a deadly weapon in the taking of her property. In light of our discussion above, this contention must fail. As to the kidnapping charges, defendant argues there was no evidence of restraint except that incident to a robbery not accomplished by use of weapons. We disagree.

Any person who unlawfully confines, restrains, or removes from one place to another any other person sixteen years of age or older without the latter's consent is guilty of kidnapping if the confinement, restraint, or removal is done for the purpose of facilitating the commission of any felony. N.C.G.S. § 14-39(a)(2) (1993). "Restraint" connotes a restraint separate and apart from that inherent in the commission of the other felony. *State v. Fulcher*, 294 N.C. 503, 523, 243 S.E.2d 338, 351 (1978). If the restraint is an inherent, inevitable element of a joined armed robbery, then no separately punishable offense of kidnapping can exist. *State v. Irwin*, 304 N.C. 93, 102, 282 S.E.2d 439, 446 (1981); *accord State v. Pigott*, 331 N.C. 199, 209, 415 S.E.2d 555, 561 (1992). The key question is whether the victim is exposed to greater danger than that inherent in the armed robbery itself or "subjected to the kind of danger and abuse the kidnapping statute was designed to prevent." *Irwin*, 304 N.C. at 103, 282 S.E.2d at 446.

State's evidence showed that first defendant threatened to kill Mr. Ross with the lug wrench. At the same time, Debbie, a heavy woman,

jumped on Mrs. Ross' chest, thereby restraining her, and covered Mrs. Ross' mouth and nose. Next defendant forcibly removed Mr. Ross from his bedroom to the living room sofa. Defendant then called Becky in, handed her the lug wrench, and instructed her to guard Mr. Ross. Becky observed that Mr. Ross' hands had been taped together. Defendant next bound Mrs. Ross' hands and feet. After she fell silent, Mr. Ross attempted to get up and help her, but someone struck him on the head with the lug wrench. Thereafter, his hands and feet were tied.

Applying the foregoing principles, we conclude there was ample evidence of restraint not inherent in the armed robbery to support the charges of kidnapping. After Mr. Ross' life was threatened, it was not necessary to remove him from one room to another in order to commit the robbery. Thus, the instant case is distinguishable from *Irwin*, wherein the defendant's objective was to steal drugs and he forcibly removed the victim to a safe at the prescription counter near the back of the store. 304 N.C. at 103, 292 S.E.2d at 446. Moreover, the evidence showed clearly Mr. Ross was exposed to further danger by his removal and further restraint in the living room, since when he attempted to help his wife, he was struck on the head. We conclude that all the restraint necessary and inherent to the armed robbery was exercised by defendant's threatening Mr. Ross with the lug wrench. When defendant removed Mr. Ross to the living room, where he was struck and then tied up, Mr. Ross was exposed to a greater danger than that inherent in the armed robbery itself. Further, in light of Mrs. Ross' physical condition, the multiple restraints actually used on her exposed her to greater danger, even death, than that inherent in the armed robbery. For all the foregoing reasons, we hold the trial court did not err in refusing to dismiss the two kidnapping charges.

**[4]** Defendant's third contention is that the court erred in admitting evidence of defendant's prior bad acts, thereby violating N.C.G.S. § 8C-1, Rules 404(b) and 608(b). Again, we disagree.

During cross-examination of State's witness Becky Hill, the following exchange took place:

Q.   Ms. Hill, that is not the first time you've been caught with things that have been stolen and blamed it on [defendant], is it?

A.   What do you mean?

Q.   Exactly what I said. This [case] is not the first time you've been caught with things in your possession that were stolen and

claimed that [defendant] stole them, is it?

A.   No.

Q.   It's not the first time, is it?

A.   No.

Q.   Tell the jury about the other time?

A.   I had been caught with a check. There was [sic] some checks in my belongings that [defendant] had given me.

On redirect examination, the prosecutor attempted to inquire into the matter of the stolen checks. Defense counsel's objection was sustained. In a bench conference, the prosecutor argued that since defense counsel had inquired into the matter on cross-examination, on redirect examination the State could ask its witness to explain. The trial court reversed its ruling, and the prosecutor asked Becky who stole the checks. She answered that defendant had given her the checks.

Assuming arguendo that the court erred in reversing its ruling and admitting the evidence, the error could not have been prejudicial. Defendant had just elicited the same evidence from Becky, and defendant has failed to show any reasonable possibility that the jury would have reached a different result had the prosecutor's question not been asked and answered. N.C.G.S. § 15A-1443(a) (1992).

**[5]**   Defendant's final contention is that the court committed plain error in instructing the jury that it could find defendant guilty of conspiracy without limiting the conspiracy to only those persons named in the indictment. Again, we disagree.

We note first that although defendant failed to raise any objection before the trial court, under the appellate rules he could raise the issue before this Court if he expressly contended that it amounted to plain error. The rules also require, however, that the alleged error be made the basis of an assignment of error, N.C. R. App. P. 10(c)(4), and defendant has failed to make a proper assignment of error. Nevertheless, in the exercise of our supervisory powers and in the interest of judicial economy, we elect to consider defendant's contention based on plain error.

Recently this Court stated the following concerning plain error:

In *Odom*, this Court adopted the "plain error" rule "to allow for review of some assignments of error normally barred by waiv-

er rules such as Rule 10(b)(2)." 307 N.C. at 659, 300 S.E.2d at 378. But we emphasized in *Odom* that the term "plain error" does not simply mean obvious or apparent error. *Id.* at 660, 300 S.E.2d at 378. Since then, we have indicated that to reach the level of "plain error" contemplated in *Odom*, the error in the trial court's jury instructions must be "so fundamental as to amount to a miscarriage of justice or which probably resulted in the jury reaching a different verdict than it otherwise would have reached." *State v. Bagley*, 321 N.C. 201, 213, 362 S.E.2d 244, 251 (1987), *cert. denied*, 485 U.S. 1036, 99 L. Ed. 2d 912 (1988) (citing *State v. Walker*, 316 N.C. 33, 340 S.E.2d 80 (1986); *State v. Odom*, 307 N.C. 655, 300 S.E.2d 375 (1983)).

*State v. Collins*, 334 N.C. 54, 62, 431 S.E.2d 188, 193 (1993).

Reviewing the entire record before us, we are convinced that the trial court did not commit plain error in failing to include the names of Debbie Hemmert and Rebecca Hill in its instructions on conspiracy. Both women testified for the State; and in the details of their testimony, each corroborated the other's account of the conspiracy made by the three in order to rob the Rosses. In addition, no evidence showed that defendant conspired with any other persons. Therefore, we hold the trial court did not err.

For the foregoing reasons, we hold defendant received a fair trial free of prejudicial error.

NO ERROR.