STATE OF NORTH CAROLINA v. WALIC CHRISTOPHER THOMAS

No. 435A96

(Filed 7 May 1999)

## 1. Constitutional Law, Federal— effective assistance of counsel—denial of motion by counsel to withdraw

The trial court did not abuse its discretion or violate defendant's constitutional right to the effective assistance of counsel by denying the motion of his two attorneys to withdraw prior to the start of his capital trial because defendant had refused to cooperate with defense counsel during trial preparation, became disruptive at the beginning of the trial, was ordered by the trial court to be handcuffed, shackled and gagged, and threatened counsel with physical violence, where the record shows that during the hearing on the motion to withdraw and throughout the trial, defendant was rational, conferred with defense counsel, and did not exhibit any more violent behavior or threaten defense counsel in any way; defendant's earlier outburst did not adversely affect the representation of defendant by his attorneys at trial; and defendant was cooperative and never requested that defense counsel be removed.

## 2. Criminal Law— shackling of defendant—findings by trial court

The reasons given by the trial court for ordering defendant shackled during his first-degree murder trial were sufficient to permit appellate review of the trial court's ruling and complied with the requirements of N.C.G.S. § 15A-1031.

## 3. Criminal Law— shackling of defendant—defendant as witness—refusal to unshackle

In a first-degree murder trial in which the trial court ordered that defendant be shackled because of outbursts in the courtroom and his threats to defense counsel at the beginning of trial, the trial court did not abuse its discretion in refusing to unshackle defendant before he took the witness stand so that defendant could step in front of the jury with photographs illustrating his testimony, although the trial court acknowledged that defendant had been well behaved throughout the trial, where the trial court determined that keeping defendant restrained was the most prudent way by which to maintain an orderly courtroom

and ensure courtroom security. In addition, the trial court's ruling did not deprive defendant of a fair trial where defendant was present in the courtroom when his case was tried, the shackles were concealed from the jury, and the photographs about which defendant testified were passed to the jury for its viewing.

### 4. Jury— peremptory challenges—race-neutral reasons

The prosecutor in a first-degree murder trial stated sufficient race-neutral reasons for his peremptory challenge of a black prospective juror where he stated that the juror was challenged because she was the only juror who had read anything about the case, the juror had lived in the community for only a short period of time, and he was looking for jurors who were solid, stable members of the community and who had a stake in the community. Defendant's rebuttal that the State had passed a number of jurors who had lived in the county a very short time was insufficient to show discriminatory intent.

### 5. Jury— excusal for cause—capital punishment views—rehabilitation denied

The trial court did not abuse its discretion in disallowing rehabilitation questions of several prospective jurors who were excused for cause because of their capital punishment views where each of the prospective jurors unequivocally stated that he or she would refuse to consider the death penalty under any circumstances.

### 6. Indigent Defendants— capital case—two appointed attorneys—absence of one attorney from courtroom—no statutory or constitutional violation

The absence of one of an indigent defendant's court-appointed defense attorneys several times during his capital trial did not violate defendant's right under N.C.G.S. § 7A-450(b1) to be represented by two attorneys in a capital case or prevent defendant's two appointed attorneys from effectively defending him since (1) the statute does not require, either expressly or impliedly, that both of a capital defendant's attorneys be present at all times for all matters, and (2) although one attorney left the courtroom during the questioning of a prospective juror, during defendant's testimony, during the instruction conference in the guilt and sentencing phases, and during arguments of the prosecutor, the longest of those absences was just four minutes, the court was in recess or held at ease during several of those

absences, and the other appointed attorney was present in the courtroom during each of those absences.

7. **Evidence— hearsay—statements by witness's attorney— admission for limited purpose—attorney-client privilege not violated**

In a prosecution for first-degree murder in which a witness testified that defendant threatened him while the two were in jail and coerced him into signing a note indicating that another person had threatened him, further testimony by the witness that his attorney told him that defendant's attorneys wanted him to find out what the witness would say if he was called by the State to testify in defendant's murder trial and asked his permission to reveal any information the witness gave him to defendant's attorneys was proper nonhearsay evidence when admitted for the limited purpose of explaining why the witness reacted to the note as he did and his subsequent conduct in testifying for the State rather than for defendant. Furthermore, defendant suffered no prejudice from this testimony where there was no evidence that defendant's counsel tried to influence the witness to give false testimony, and there was no evidence that the witness's attorney violated the attorney-client privilege by revealing any information concerning the witness to defendant's attorneys.

8. **Discovery— crime records of witnesses—provision by State not required**

Defendant was not denied due process when the trial court denied his motion to require the State to provide him with the criminal records of all of the prosecution witnesses in his first-degree murder trial where the record discloses that defense attorneys successfully elicited testimony from the witnesses on cross-examination about their various criminal convictions, including possession and sale of drugs, breaking and entering, and larceny; and any additional impeaching evidence gleaned from the criminal records of these witnesses would not have created a reasonable doubt of defendant's guilt which did not otherwise exist.

9. **Criminal Law— mistrial—reference to unrelated robbery— denial not abuse of discretion**

The trial court did not abuse its discretion in denying defendant's motion for a mistrial in a first-degree murder trial when a State's witness referred to an unrelated armed robbery charge

against defendant where any error was cured by the trial court's action in sustaining defendant's objection and giving a curative instruction.

**10. Criminal Law— mistrial—mistaken reference to prior murders—denial not abuse of discretion**

The trial court did not abuse its discretion in denying defendant's motion for a mistrial when the prosecutor, during cross-examination of defendant concerning his convictions for two prior robberies, mistakenly referred to the prior convictions as "two murders," although the trial court did not issue a curative instruction to the jury, where defendant failed to request a curative instruction, defendant denied that he had pled guilty to "two murders," and the prosecutor quickly corrected himself.

**11. Robbery— armed robbery—sufficiency of evidence**

The State's evidence was sufficient to support defendant's conviction of armed robbery and felony murder based upon the felony of armed robbery where it tended to show that the victim was bound, gagged and stabbed to death in his own home; defendant was seen at a sports bar located just a couple of hundred feet from where the victim lived on the night of the victim's murder; defendant's palm print was found on the stove in the victim's home; defendant was seen driving the victim's car and using the victim's automatic-teller machine card shortly before the victim's body was discovered; and the victim's clothing and other items stolen from the victim were seized from defendant's room.

**12. Sentencing— capital sentencing—aggravating circumstance—felony murder—underlying felony—conviction also based on premeditation**

The felony underlying a conviction for felony murder may be submitted as an aggravating circumstance under N.C.G.S. § 15A-2000(e)(5) if the defendant is also convicted of first-degree murder on the basis of premeditation and deliberation.

**13. Kidnapping— restraint separate from armed robbery**

There was sufficient evidence of restraint not inherent in the armed robbery of the victim to support defendant's conviction of kidnapping where the evidence showed that the victim was found lying on the floor of his home with his hands tied behind his back; the victim also had an apron tied around his neck and several

towels and a stuffed toy around his mouth and face; and the victim was repeatedly stabbed and cut while he was restrained. The elements of armed robbery do not require that defendant bind and gag the victim in such a manner, and the victim was subjected to the kind of danger and abuse the kidnapping statute was designed to prevent.

**14. Burglary— constructive breaking—modus operandi—sufficiency of evidence**

Sufficient evidence was presented of a constructive breaking accomplished by deception or trick to support defendant's conviction of first-degree burglary where the State relied on the testimony of a witness who had been assaulted and robbed by defendant after he tricked his way into her house to establish defendant's modus operandi; the witness testified that defendant rang her doorbell and asked to use the phone to get help because his car had broken down; once inside the kitchen, defendant asked for the telephone book and a glass of water; in the present case, defendant testified that, although he did not know the victim, he had been in the victim's kitchen because he had asked the victim for a drink of water; a cab company had received a call at about the time of the murder of the victim requesting that a cab come to the victim's address, and police found a telephone book opened to the taxicab pages; the witness testified that defendant had stabbed her in the neck with a knife taken from her kitchen, and in the present case, the victim was stabbed in the neck with a knife taken from his kitchen; in both offenses, the victim's wallet or pocketbook had been stolen; and defendant's palm print was found on the stove in the victim's kitchen. This evidence permitted the inference that defendant tricked his way into the victim's house in the same manner that he tricked his way into the witness's house.

**15. Homicide— first-degree murder—instruction on second-degree not warranted**

The trial court did not err by refusing to instruct the jury on second-degree murder as a lesser included offense of first-degree murder because the jury could not have reasonably concluded that defendant killed the victim without premeditation and deliberation where the evidence tended to show that defendant entered the victim's home by trick and attacked him without provocation; the victim was bound and helpless during the murder; the victim suffered thirty-six stab wounds to his body

inflicted with a butcher knife, many of which had been inflicted while the victim was still alive; and the only evidence offered by defendant to negate first-degree murder was his own testimony denying his involvement in the crime.

**16. Burglary— first-degree burglary—occupancy—failure to instruct on second-degree burglary—not plain error**

The trial court did not commit plain error in a first-degree burglary prosecution by failing to instruct the jury on the lesser included offense of second-degree burglary where the State presented evidence tending to show that the victim had returned to and was occupying his home when defendant broke into the victim's home and entered it to rob and murder him.

**17. Evidence— fingerprint or palm print—probative value— instructions**

In this murder, burglary, armed robbery and kidnapping prosecution in which the State presented evidence that defendant's palm print was found on a stove in the victim's kitchen and defendant testified that he had been inside the victim's house to get a drink of water on the night of the crimes but left while the victim was still alive, the trial court's instruction that if the jury found "substantial evidence of circumstances that the fingerprints were impressed at or about the time these crimes were committed, then it would be evidence which logically tends to show that the accused was present and participated in the commission of these crimes" was correct based on the evidence presented where the trial court also gave defendant's requested instruction that a fingerprint or palm print of the defendant is without probative force unless it could only have been impressed at the time the crime was committed; in addition to defendant's palm print, the State presented substantial circumstantial evidence tending to prove defendant's guilt, including defendant's proximity to the victim's house on the night of the crimes, a telephone call to a cab company placed from the victim's house, the victim's car and other personal items found in defendant's possession, and a videotape of defendant using the victim's automatic teller machine card; and defendant initially denied being in the victim's house but changed his story only after the evidence of the palm print was presented by the State. It was a matter for the jury to decide whether to believe the State's or defendant's explanation of how and when defendant's palm print was left in the victim's kitchen.

STATE v. THOMAS

[350 N.C. 315 (1999)]

**18. Criminal Law— circumstantial evidence—instructions**

The trial court did not err by refusing to instruct the jury that, in order to support a conviction, circumstantial evidence must be inconsistent with innocence; rather, the trial court properly instructed the jury that the law makes no distinction between the weight to be given either circumstantial or direct evidence and that "[a]fter weighing all the evidence if you're not convinced of the guilt of the defendant beyond a reasonable doubt, you must find him not guilty."

**19. Burglary— possession of recently stolen property—inference of guilt—instructions**

The trial court's instructions in a burglary case did not imply that defendant's mere physical proximity or·the mere fact that an article is found in a place under the dominion and control of the defendant would be sufficient to trigger the inference of guilt from the doctrine of the possession of recently stolen property; rather, the trial court properly instructed the jury that such an inference requires other circumstances in addition to defendant's physical proximity to or control over the place where the stolen property is found.

**20. Kidnapping— first-degree kidnapping—restraint of victim—failure to release in safe place**

The first-degree kidnapping element of failure to release the victim in a safe place applies to a kidnapping by restraint and confinement and not just to kidnapping by removal. Therefore, the element of failure to release the victim in a safe place was supported by evidence that the kidnapping was accomplished by restraint of the victim in his own house, and that the victim was found in his house stabbed to death with his hands tied behind his back.

**21. Constitutional Law, Federal— double jeopardy—first-degree kidnapping—felony murder—failure to release in safe place—not murder element**

Defendant's convictions and sentencing for both first-degree kidnapping and felony murder did not subject him to double jeopardy where his first-degree kidnapping conviction was based on the element that he did not "release the victim in a safe place" and not on the element of "serious injury." Furthermore, since defendant's first-degree murder conviction was based not only on the felony murder rule but also on premeditation and delibera-

tion, proof of the underlying felony was not an essential element of the State's homicide case, and defendant could be sentenced for both the murder and the felony.

**22. Criminal Law— prosecutor's closing argument—reading excerpt from appellate opinion**

The trial court did not err by allowing the prosecutor to read an excerpt from a North Carolina Supreme Court opinion in another case during closing argument where this argument accurately stated the law of North Carolina and related to principles of law which were relevant to the evidence and issues of the case concerning the constructive breaking element of burglary.

**23. Evidence— prior crime or act—modus operandi—proof of relevant facts**

In this prosecution for first-degree murder, first-degree burglary, armed robbery and first-degree kidnapping, testimony by a witness that defendant had previously tricked his way into her house and assaulted her with a kitchen knife was properly admitted into evidence where the trial court found that the similarities between the assault on the witness and the crimes for which defendant was being tried had probative value, and tended to prove relevant facts, including the motive for the burglary, the method of nonforceable entry into the home, the intent of the killer to commit a robbery, the specific intent to kill, a specific plan or design to commit the burglary, robbery, and murder, and a pattern of behavior tending to show that defendant committed both crimes. Furthermore, the trial court did not err by ruling that the probative value of this testimony outweighed any prejudicial effect. N.C.G.S. § 8C-1, Rules 404(b), 403.

**24. Evidence— admission of testimony—error cured by court's actions**

Any error in the admission of testimony in this capital sentencing proceeding by the mortician who prepared the victim's body for burial to show that the victim had been forcibly gagged in order to establish the especially heinous, atrocious, or cruel aggravating circumstance was cured when the trial court properly addressed defense counsel's objections to the testimony by requiring the prosecutor to provide additional evidence to establish the probative value of the mortician's testimony, granted defendant's motion to strike the testimony because the prosecu-

tor failed to do so, and instructed the jury to disregard the testimony. In addition, the especially heinous, atrocious, or cruel aggravating circumstance was supported by properly admitted evidence that the victim was bound and stabbed repeatedly and that many wounds were inflicted while he was still alive.

**25. Evidence— prior crime or act—stipulation—description of manner—prior violent felony aggravating circumstance**

Testimony of a robbery victim's description of the manner in which the robbery took place was properly admitted in this capital sentencing proceeding to support the (e)(3) aggravating circumstance that defendant had been convicted of a prior violent felony even though defendant stipulated to the conviction and judgment for the robbery. N.C.G.S. § 15A-2000(e)(3).

**26. Criminal Law— defendant's closing argument—capital sentencing—individual responsibility of each juror**

There was no abuse of discretion or prejudice to defendant when the trial court prevented defense counsel from arguing to the jury in a capital sentencing proceeding that the ultimate decision as to the sentence recommendation was the individual responsibility of each juror.

**27. Criminal Law— prosecutor's closing argument—capital sentencing—applicable principles**

The principles that trial counsel are granted wide latitude in the scope of jury argument and that control of closing arguments is in the discretion of the trial court apply not only to ordinary jury arguments but also to arguments made in capital sentencing proceedings, and the boundaries for jury argument at the capital sentencing proceeding are more expansive than at the guilt phase.

**28. Criminal Law— prosecutor's closing argument—absence of objection—standard of review**

Where there has been no objection during the closing argument, the proper standard of review is whether the argument was so grossly improper as to require the trial court to intervene ex mero motu, not whether the argument constitutes plain error.

**29. Criminal Law— prosecutor's closing argument—capital sentencing—mitigating circumstances—not gross impropriety**

The prosecutor's closing argument in a capital sentencing proceeding that in order for the mitigating circumstances to have value to weigh against the aggravating circumstances, they had to "justify," "excuse," or "offset" the first-degree murder did not amount to a gross impropriety requiring intervention by the trial court on it own motion.

**30. Criminal Law— prosecutor's closing argument—defendant as cold-bloodied killer—inference from evidence**

The prosecutor's closing argument in a capital sentencing proceeding that "[defendant] is a cold-bloodied, arrogant killer, who would take your life and my life" drew reasonable inferences from the evidence and was not improper considering the evidence of the brutality of the premeditated and deliberate murder committed by defendant. Further, the phrase that defendant would "take your life and my life" was no more than a figure of speech for this defendant's willingness to murder a stranger for money.

**31. Criminal Law— prosecutor's closing argument—capital sentencing—death penalty as deterrence**

The prosecutor's closing argument in a capital sentencing proceeding that "if you impose life imprisonment . . . the State will do everything they can to make sure he stays in prison for the rest of his life, but . . . nothing is final" and that "the only way you can make sure that . . . this man does not assault, rob, and kill someone else is to impose the death penalty" was not an improper argument addressing parole but was a proper argument that only the death penalty would deter defendant from committing future crimes.

**32. Sentencing— capital sentencing—death penalty not disproportionate**

A sentence of death imposed upon defendant for first-degree murder was not excessive or disproportionate where the jury found defendant guilty of first-degree murder under theories of both premeditation and deliberation and felony murder; the evidence tended to show that defendant repeatedly stabbed the victim in his own home while he was bound and helpless, and while he was still conscious; and the jury found as aggravating circum-

stances (1) that defendant had been previously convicted of a felony involving the use or threat of violence to the person, (2) that this murder was committed while defendant was engaged in the commission of a robbery, burglary, or kidnapping, and (3) that this murder was especially heinous, atrocious, or cruel.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Greeson, J., on 9 August 1996 in Superior Court, Guilford County, upon a jury verdict finding defendant guilty of first-degree murder. Defendant's motion to bypass the Court of Appeals as to his appeal of additional judgments was allowed by the Supreme Court on 12 May 1997. Heard in the Supreme Court 11 January 1999.

*Michael F. Easley, Attorney General, by John G. Barnwell, Assistant Attorney General, for the State.*

*James R. Parish for defendant-appellant.*

MITCHELL, Chief Justice.

On 2 October 1995, defendant was indicted for first-degree murder. On 19 February 1996, he was also indicted for first-degree burglary, robbery with a dangerous weapon, and first-degree kidnapping. Defendant was tried capitally at the 22 July 1996 Criminal Session of Superior Court, Guilford County. The jury found defendant guilty of first-degree murder on the basis of premeditation and deliberation and under the felony murder rule. The jury also found defendant guilty of first-degree burglary, robbery with a dangerous weapon, and first-degree kidnapping. Following a separate capital sentencing proceeding, the jury recommended a sentence of death for the first-degree murder conviction. On 9 August 1996, the trial court sentenced defendant to death. Defendant was sentenced to consecutive terms of imprisonment on his convictions for burglary, robbery, and kidnapping. Defendant appealed his conviction for first-degree murder and death sentence to this Court as of right. On 12 May 1997, this Court granted defendant's motion to bypass the Court of Appeals on his appeal of the robbery, burglary, and kidnapping convictions.

The State's evidence tended to show that defendant, Walic Christopher Thomas, entered the home of the victim, Kenneth Dale Tuttle, Jr., bound and gagged him, robbed him, and stabbed him to death. On the evening of 10 September 1995, defendant asked

Carmichael Wilson to give him a ride so that he could get some money from his supervisor. Wilson had his friend, William Thomas Warren (known as "Rabbit"), drive them to where defendant wanted to go. Rabbit parked his car on a side street around the corner from the intersection of Spring Garden Road and Holden Road in Greensboro. While Wilson and Rabbit waited in the car, defendant walked to J.P. Looney's, a sports bar located at that same intersection. A bartender working that night later identified defendant as the man who came into the bar sometime "around midnight" and asked for free food. Several times Wilson checked on defendant, who assured him that he would have the money soon. Finally, at approximately 1:30 a.m., Wilson talked to the bartender, who told him that defendant had left the bar a short time before.

That same night, Tuttle went to the home of a friend to watch a football game. At about 11:30 p.m., Tuttle left the friend's house to return to his own house located at 707 South Holden Road, a few hundred feet from J.P. Looney's. At 1:41 a.m. on 11 September 1995, a dispatcher for Daniel Keck Cab Company received a call requesting a taxi to come to Tuttle's address. The dispatcher testified that the caller called a second time to find out why the cab had not arrived. At 2:10 a.m., a driver was dispatched to 707 South Holden Road. The driver testified that when he arrived no one came outside and that he noticed a light blue or gray car parked in the driveway.

At 4:30 a.m., Tuttle's roommate arrived home. As he was starting to open the back door, he looked in the window and saw Tuttle on the floor, against the door. The roommate went to a neighbor's house and called the police.

The first officer on the scene determined that Tuttle was dead. Tuttle was found with a towel, a rag, and a stuffed toy around his head, an apron around his feet, and his hands tied behind his back with a telephone cord. An autopsy revealed that he had bled to death from thirty-six stab wounds to his neck, chest, and abdominal area, most of which were inflicted while Tuttle was still alive. According to the testimony of Dr. Thomas Clark of the Chief Medical Examiner's Office, Tuttle's wounds "could have been inflicted by a butcher knife."

Tuttle's roommate went through the house and discovered that several items of personal property were missing, including two knives from a knife block in the kitchen, Tuttle's clothing, a television set, a stereo, and Tuttle's wallet. Also missing was Tuttle's car, a

silver-gray Nissan Sentra. One of the prints lifted from the stove door handle in the home was later determined to have been made by the left palm of defendant. The investigating officer also found a telephone book opened to the taxicab pages and an ice tray and plastic cup next to the kitchen sink.

After Wilson had returned to his house on Martin Luther King Drive, he saw defendant, who lived two houses away from him, arrive in a car. Defendant told Wilson that his supervisor had let him keep the car and that his supervisor had also given him the clothes which were in the car. Defendant asked Wilson to help him carry the clothes upstairs to defendant's room. Wilson then drove with defendant to a bank where defendant was videotaped attempting to withdraw cash using Tuttle's automatic-teller machine card at 4:20 a.m. on 11 September 1995. While waiting in the car, Wilson noticed a wallet containing a white man's driver's license on the seat.

On 11 September 1995, a member of the Greensboro Police Department stopped Tshamba Wynn while he was driving Tuttle's car on Julian Street. James Harold Edwards testified that he saw defendant give the keys to the stolen car to Wynn. Edwards directed the officers to defendant's address at 707 Martin Luther King Drive. When the police knocked on the door, defendant answered. Defendant gave his consent for a search of his room. On a couch, officers found a stack of men's clothes still on plastic hangers. These clothes were later identified as belonging to Tuttle. Defendant was arrested. At the time of his arrest, defendant was wearing a shirt and a pair of pants belonging to Tuttle. The stereo and television set stolen from Tuttle's house were later recovered from a crack house where Wilson testified he had gone with defendant.

Defendant testified on his own behalf, admitting that he had been in Tuttle's home with Wilson and Rabbit on the night of the murder. According to defendant, Wilson came to him asking for a ride to a "white dude's house" to settle a drug debt. Defendant testified that when he left the house with Rabbit, Wilson stayed behind, and Tuttle was still alive.

**PRETRIAL AND JURY SELECTION**

[1] By his first assignment of error, defendant contends that the trial court erred by denying the motion of his two attorneys to withdraw. Just prior to the start of the trial, defendant threatened to tip over a table and refused to come into the courtroom voluntarily. The trial

**STATE v. THOMAS**

[350 N.C. 315 (1999)]

court ordered that he be handcuffed and shackled. After returning to the courtroom, defendant became very disruptive and refused to be quiet. The trial court then directed a bailiff to remove defendant and gag him.

Defense counsel met with defendant in the holding cell in an effort to get him to cooperate. During this meeting, defendant threatened defense counsel with physical violence, stating, "I'll have my people on the street take care of you." Defendant also threatened a deputy sheriff. In addition, during trial preparation, defendant had refused to cooperate or to speak to defense counsel. Defense counsel informed the court that they feared for their safety and could no longer effectively represent defendant. They moved to withdraw pursuant to N.C.G.S. § 15A-144. Defendant argues that this created an actual conflict of interest and that forcing defense counsel to represent him violated his constitutional right to the effective assistance of counsel and his due process right to a fair trial.

N.C.G.S. § 15A-144 provides that "[t]he court may allow an attorney to withdraw from a criminal proceeding upon a showing of good cause." In order to establish prejudicial error arising from the trial court's denial of a motion to withdraw, a defendant must show that he received ineffective assistance of counsel. *State v. Cole*, 343 N.C. 399, 411, 471 S.E.2d 362, 367 (1996), *cert. denied*, —— U.S. ——, 136 L. Ed. 2d 624 (1997). To establish ineffective assistance of counsel, defendant must satisfy a two-prong test which was promulgated by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693 (1984). We reviewed the operation of this test in the recent case of *State v. Lee*:

> [D]efendant must first show that counsel's performance fell below an objective standard of reasonableness as defined by professional norms. [*State v. Braswell*, 312 N.C. 553, 561-62, 324 S.E.2d 241, 248 (1985).] . . . Second, once defendant satisfies the first prong, he must show that the error committed was so serious that a reasonable probability exists that the trial result would have been different absent the error. [*Strickland*, 466 U.S.] at 695, 80 L. Ed. 2d at 698. Thus, defendant must show that the error committed was so grave that it deprived him of a fair trial because the result itself is considered unreliable. *Id.* at 687, 80 L. Ed. 2d at 693.

348 N.C. 474, 491, 501 S.E.2d 334, 345 (1998).

**STATE v. THOMAS**

[350 N.C. 315 (1999)]

In the present case, a careful review of the record and transcript reveals that during the hearing on the motion to withdraw and throughout the trial, defendant was rational, conferred with defense counsel, and did not exhibit any more violent behavior or threaten defense counsel in any way. We find no indication that defendant's earlier outburst adversely affected the representation of defendant by his attorneys at trial. Defendant was cooperative and never requested that defense counsel be removed. At the hearing on the motion to withdraw, defendant stated, "I don't have a problem with them at all." At most, defendant indicated to the trial court that his only dissatisfaction with defense counsel was their handling of certain statements of several individuals. However, disagreements over trial tactics generally do not make the assistance of counsel ineffective. *See State v. Gary*, 348 N.C. 510, 515, 501 S.E.2d 57, 61 (1998). Defendant has failed to show that the experienced defense counsel's representation of him in this case was anything less than professional. Therefore, the first prong of the *Strickland* test is not satisfied. As a result, we conclude that the trial court did not abuse its discretion in denying defense counsel's motion to withdraw. Accordingly, this assignment of error is overruled.

[2] Defendant next contends that the trial court violated N.C.G.S. § 15A-1031 by failing to make necessary findings in support of its initial decision to shackle him and that the trial court abused its discretion in refusing to unshackle him before he took the witness stand, denying him a fair trial. After defendant's outburst in the courtroom and his threats to defense counsel, the trial court ordered him restrained. At the request of the trial court, defendant was examined by a psychiatrist, Dr. Rollins, who testified at the competency hearing that defendant was competent to stand trial. Following this testimony, defendant was questioned by the trial court and said that he would be quiet and cooperative and would follow all of the court's rules. The trial court continued to have defendant shackled. At trial, before defendant took the stand, defense counsel again requested that the shackles be removed so that defendant could step in front of the jury with photographs illustrating his testimony. The trial court denied the request, despite the fact that the court acknowledged that defendant's conduct had been "exemplary" since the initial outburst. The photographs were, however, passed to the jury. Defendant argues that this procedure was in sharp contrast to the procedure used with the other witnesses, who were allowed to step down from the witness box and approach the jury to illustrate their testimony, and prejudiced defendant in the jury's eyes. This argument is without merit.

The restraint of a defendant in the courtroom is governed by N.C.G.S. § 15A-1031, which provides in part:

> A trial judge may order a defendant or witness subjected to physical restraint in the courtroom when the judge finds the restraint to be reasonably necessary to maintain order, prevent the defendant's escape, or provide for the safety of persons.

N.C.G.S. § 15A-1031 (1997). The statute further provides that if the judge orders a defendant or witness restrained, he must enter in the record the reasons for his actions, give the restrained person an opportunity to object, and, unless there is an objection, inform the jurors not to consider the restraint in weighing evidence or determining guilt. "If the restrained person controverts the stated reasons for restraint, the judge must conduct a hearing and make findings of fact." *Id.*

The transcript and record reveal that the reasons given by the trial court in ordering defendant shackled are sufficient to permit our appellate review of the trial court's ruling. At the time the trial court initially ordered that defendant be shackled, it stated that the restraints were necessary in order to have defendant in the courtroom to begin the trial, and "I'm not going to have this case prejudiced from the get-go, for him making some sort of scene." Following defendant's continued violent behavior and threats to counsel, the trial court made the following findings of fact in a safekeeping and evaluation order signed that very same afternoon:

2. That at 2:00 p.m. courtroom bailiffs warned all parties that the Defendant had indicated that he would become violent and tip over a table.

3. That at 2:00 p.m. the case was called for trial and the Defendant refused to come to the courtroom from the holding cell.

4. That the court ordered the courtroom bailiffs to take whatever measures necessary to bring Defendant to the courtroom.

5. That the Defendant was shackled and it still took five bailiffs to bring him to the courtroom, and the Defendant still caused a disturbance which prevented further proceedings in court.

6. That the Court ordered the Defendant be taken to a small office out of the presence of the court to confer with his attor-

neys. That the Defendant at that time threatened his attorneys and one of the bailiffs with physical injury.

Two days later, out of the presence of the jury, the trial court stated for the record its reasons for ordering that defendant's legs would remain shackled during trial:

> [I]t's my feeling . . . that from what occurred on Monday, at this time, I'm going to continue to have the defendant shackled at this point. [A]ny reocurrence of what occurred Monday would endanger the court personnel, would endanger, . . . maybe endanger the jury. And from what the court observed on Monday, a situation could arise that just couldn't be stopped in an amount of time that someone could get hurt, and probably the defendant. And so, I don't—because of that, I'm going to have the shackles there. And I'll have curtains put on the tables, to make sure that nobody can see the shackles in this case.

We find that these reasons adequately explain the trial court's actions regarding the restraint of defendant and that the trial court complied with the statute.

Furthermore, at the time that defendant was to take the stand, the trial court once again stated its reasons for denying counsel's request to remove defendant's shackles:

> I just want the record to reflect that I just—the observation I saw on the first day of this trial was that I felt like that to unshackle him would put at risk the jury and the court personnel, if he decided to change his mind. And also, [let] the record reflect that his behavior since that time has probably been the best that I've seen a defendant in a capital case, in the eight that I've—or nine that I've tried. But that first day put me on alert that I'd be putting people at risk.

[3] Although the trial court acknowledged that defendant had been well behaved throughout the trial, it is clear that in light of defendant's earlier violent outbursts and disruptions, the trial court determined that keeping him restrained was the most prudent way by which to maintain an orderly courtroom and ensure courtroom security. *See State v. Atkins*, 349 N.C. 62, 92, 505 S.E.2d 97, 116 (1998). We conclude that the trial court did not abuse its discretion. In addition, the trial court's ruling did not deprive defendant of a fair trial. Defendant was present in the courtroom when his case was tried, the shackles were concealed from the jury, and the photographs about

which defendant testified were passed to the jury for their viewing. Therefore, we reject this assignment of error.

**[4]** We next examine defendant's assignments of error pertaining to the jury selection process. Defendant first argues that the trial court erred by allowing the prosecution to peremptorily excuse a black prospective juror on the basis of race. The use of peremptory challenges for racially discriminatory reasons violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69 (1986). Article I, Section 26 of the North Carolina Constitution also prohibits such discrimination.

A defendant making a *Batson* objection must establish a *prima facie* case of discrimination by showing that he is a member of a cognizable racial minority whose members the State has peremptorily excused from the venire under circumstances which raise an inference of racial motivation. *State v. Porter*, 326 N.C. 489, 497, 391 S.E.2d 144, 150 (1990). "[A] defendant also has standing to complain that a prosecutor has used the State's peremptory challenges in a racially discriminatory manner even if there is not racial identity between the defendant and the challenged juror." *State v. Locklear*, 349 N.C. 118, 136, 505 S.E.2d 277, 287 (1998), *cert. denied*, —— U.S. ——, —— L. Ed. 2d ——, 1999 WL 118758 (Apr. 19, 1999) (No. 98-8310). If a defendant is successful in making a *prima facie* showing of discrimination, the burden then shifts to the State to offer a race-neutral reason for the peremptory strike. *State v. Robinson*, 330 N.C. 1, 16, 409 S.E.2d 288, 296 (1991). The trial court must then make appropriate findings as to whether the prosecution's stated reasons provide a credible, non-discriminatory basis for the challenges or are simply a pretext. *Id.* Finally, the trial court must "determine whether the defendant has carried his burden of proving purposeful discrimination." *Hernandez v. New York*, 500 U.S. 352, 359, 114 L. Ed. 2d 395, 405 (1991). "Because the trial court is in the best position to assess the prosecutor's credibility, we will not overturn its determination absent clear error." *State v. Cummings*, 346 N.C. 291, 309, 488 S.E.2d 550, 561 (1997), *cert. denied*, —— U.S. ——, 139 L. Ed. 2d 873 (1998); *see also State v. Kandies*, 342 N.C. 419, 434-35, 467 S.E.2d 67, 75, *cert. denied*, —— U.S. ——, 136 L. Ed. 2d 167 (1996).

In this case, defendant is black and the victim was white. Defendant made his *Batson* challenge when the prosecutor peremptorily challenged prospective juror Dandridge, a black female. In sup-

port of his objection, defendant noted that the prosecutor had previously exercised three peremptory challenges, excusing two black females and one white female. Because the white female juror had indicated that she could not sit in judgment and consider the death penalty, the trial court noted that she could have been excused for cause. Despite the fact that the State had previously accepted three black jurors, the trial court then stated, "I feel like I'm going to be tighter than I normally would." Then the trial court ruled that a *prima facie* case had been established and required the State to give its reasons for excusing Ms. Dandridge. Thereafter, the following exchange took place:

> [PROSECUTOR]: Your honor, of the 65 or 70 jurors we have come across so far, this is the only juror that has ever indicated that she read anything in the media. . . .

> Secondly, she has lived in the community for only four years. And her background is not, based upon the questionnaire, based upon the questions I asked her, there's insufficient information about her background for me to determine that she's the type of juror that I want. And what I want is a juror who has lived in the community for a substantial period of time, who has roots in the community, who is employed, and is a solid member of our community. And I just don't have sufficient information about her, based upon her questions and answers, based upon the questionnaire, to make that determination. Those are my two reasons.

> [DEFENSE COUNSEL]: Well, we have made the observation that there are a number of jurors who have been passed by the State that have lived in Guilford County a very short period of time. And we would ask the Court, through the questionnaires, to take note of the fact that that is not a legitimate reason, in that there are other jurors that have already been seated, passed by the State, that have lived here a very short period of time.

Defendant now contends that the prosecutor's questioning of Ms. Dandridge was "perfunctory at best" and that the explanation that she was not "the type" of juror he wanted was racially motivated.

At the outset, we note that "the issue is the validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Hernandez*, 500 U.S. at 360, 114 L. Ed. 2d at 406. Furthermore, so long as the motive is not racial discrimination, the

prosecutor may exercise peremptory challenges on the basis of "legitimate 'hunches' and past experience." *State v. Antwine*, 743 S.W.2d 51, 65 (Mo. 1987), *cert. denied*, 486 U.S. 1017, 100 L. Ed. 2d 217 (1988).

Here, the prosecutor stated as his criteria for selecting jurors that they be solid, stable members of the community. We have found this to be a legitimate, race-neutral reason for exercising a peremptory challenge. *See State v. Jackson*, 322 N.C. 251, 257, 368 S.E.2d 838, 841 (1988), *cert. denied*, 490 U.S. 1110, 104 L. Ed. 2d 1027 (1989). Moreover, in its brief, the State points out that the prosecutor in this case consistently sought jurors who had an established stake in the community. We also conclude that the prosecutor's explanation that Ms. Dandridge was the only juror who had read anything about the case was a statement of a legitimate and nondiscriminatory reason for the exercise of a peremptory challenge. These reasons given by the prosecutor are supported by Ms. Dandridge's responses during jury *voir dire*.

Defendant's rebuttal was that the State had passed a number of jurors who have lived in Guilford County a very short time. However, we have previously rejected a defendant's attempt to show discriminatory intent by "finding a single factor among the several articulated by the prosecutor as to each challenged prospective juror and matching it to a passed juror who exhibited that same factor." *Porter*, 326 N.C. at 501, 391 S.E.2d at 152. The prosecutor in this case pointed to the fact that Ms. Dandridge was the only juror out of sixty-five or seventy questioned who had read about the case, as well as her lack of a stake in the community as a basis for the challenge.

After the prosecutor articulated his reasons for dismissal and after listening to defendant's arguments, the trial court rendered its conclusion, as follows:

THE COURT: That is a racially neutral reason, though, and he can exclude—so I'm going to deny the motion. The object—I'm going to overrule the objection. I feel like that is a racially neutral reason. . . . I feel like you're sincere, and that's what you're looking for.

Defendant contends that this ruling by the trial court on the *Batson* claim was incomplete and that the cause must be remanded for the entry of specific findings of fact. We do not agree with defendant.

We note that "[s]uch findings are not necessary when there is no *material* conflict in the evidence." *Id.* at 502, 391 S.E.2d at 153. A

STATE v. THOMAS

[350 N.C. 315 (1999)]

review of the record here discloses that the facts are not in dispute. As stated above, the record contains the transcript of the explanations offered by the prosecutor. The trial judge found those explanations to be adequate, race neutral, and sufficient to rebut defendant's *prima facie* case under *Batson*. "Since the trial judge's findings . . . largely will turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference." *Batson*, 476 U.S. at 98 n.21, 90 L. Ed. 2d at 89 n.21. Therefore, we conclude that the trial court did not err in denying defendant's *Batson* claim as to Ms. Dandridge.

**[5]** Next, defendant contends that the trial court erred in disallowing rehabilitation questions of several prospective jurors concerning their views on capital punishment, thereby denying him his rights to a fair and impartial jury. While defendant refers to four pages in the transcript involving four different prospective jurors, we note that in his brief defendant discusses only two of these prospective jurors, McDonald and Blackard. However, defendant was allowed to ask rehabilitation questions of McDonald and Blackard. Furthermore, all four of these prospective jurors were unequivocal in their refusal to consider the death penalty under any circumstances. They made such statements as, "I cannot consider the death penalty," "I would probably always vote for life imprisonment," and "There's no question I would select life in prison." These jurors were all excused for cause. Although a defendant has the right to question prospective jurors about their views on capital punishment,

> judges are not required to allow a defendant to attempt to rehabilitate jurors challenged for cause. A trial court in its sound discretion may refuse a defendant's request to attempt to rehabilitate certain jurors challenged for cause by the State.

*State v. Skipper*, 337 N.C. 1, 18, 446 S.E.2d 252, 261 (1994), *cert. denied*, 513 U.S. 1134, 130 L. Ed. 2d 895 (1995). We conclude that the trial court did not abuse its discretion by refusing to allow rehabilitation questions of these prospective jurors. This argument is meritless.

In a related assignment of error, defendant contends that the trial court erred in excusing prospective jurors McDonald and Blackard for cause. Initially, Mr. McDonald stated to the trial court, "I've tried not to make a determination about whether I would or would not vote for or against the death penalty." After explaining the law to Mr. McDonald, the trial court ended by asking him, "Are you saying at this

time you could not say that you could fairly and impartially consider both of these [sentences], even though that is the law?" Mr. McDonald responded, "Yes, sir." Following defendant's attempted rehabilitation of Mr. McDonald, the trial court again questioned Mr. McDonald as follows:

> THE COURT: . . . [I]f you were given the option between life imprisonment and the death penalty, would you always vote against the death penalty or would you consider it fairly and objectively?
>
> MR. McDONALD: I think, to sum this up, I would probably always vote for life imprisonment.

The next juror, Mr. Blackard, first stated, "I suspect I would have a problem of deciding and voting for the death penalty." After questioning by the trial court, Mr. Blackard indicated that he would always vote for life imprisonment if it was an option. During questioning by defense counsel and the prosecutor, Mr. Blackard said he believed that he could consider both options, but continued to express his doubts about his ability to vote for the death penalty. Finally, in response to the last question by the prosecutor asking him whether he could impose the death penalty "if the State proved beyond a reasonable doubt that the death penalty is the appropriate punishment in this case," Mr. Blackard said, "I doubt it very seriously."

Defendant argues that these two jurors should not have been excused for cause because they indicated that they could consider life imprisonment *and* the death penalty as options in sentencing. He says that their preference for life imprisonment as a punishment was because they "believed they had to give an opinion as to whether they could or could not consider and vote for the death penalty without having heard any of the evidence." Defendant argues that further questioning to clarify this issue "would likely have produced different answers and made them inappropriate jurors to be challenged."

The standard for determining whether a prospective juror may properly be excused for cause is whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt*, 469 U.S. 412, 424, 83 L. Ed. 2d 841, 851-52 (1985). The decision to excuse a prospective juror is within the discretion of the trial court because "there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faith-

fully and impartially apply the law." *Id.* at 425-26, 83 L. Ed. 2d at 852. Applying the *Wainwright* standard here, we conclude that the trial court did not abuse its discretion in excusing prospective jurors McDonald and Blackard for cause.

## GUILT-INNOCENCE PHASE

**[6]** By another assignment of error, defendant contends that the repeated absences during the trial of one of his court-appointed defense attorneys infringed upon his right to the assistance of two attorneys in a capital case as provided by N.C.G.S. § 7A-450(b1). Mr. Wallace C. Harrelson was appointed by the trial court to represent defendant. Mr. Harrelson left the courtroom during the questioning of a prospective juror, during defendant's testimony, during the instructions conference in the guilt and sentencing phases, and during arguments of the prosecutor. Defendant argues that the trial court's failure to halt the proceedings during Mr. Harrelson's absences prevented his two appointed attorneys from effectively defending him and that the presence of both appointed attorneys is required at all times in the capital trial of an indigent defendant. This argument is without merit.

The governing statute provides in relevant part:

An indigent person indicted for murder may not be tried where the State is seeking the death penalty without an assistant counsel being appointed in a timely manner. If the indigent person is represented by the public defender's office, the requirement of an assistant counsel may be satisfied by the assignment to the case of an additional attorney from the public defender's staff.

N.C.G.S. § 7A-450(b1) (1995). This statute "states simply but unequivocally that an indigent facing a possible death penalty may not be tried unless an assistant counsel has been appointed in a timely manner." *State v. Hucks*, 323 N.C. 574, 579, 374 S.E.2d 240, 244 (1988). It does not require, either expressly or impliedly, that *both* of a capital defendant's attorneys be present at *all* times for *all* matters.

In this case, Mr. Harrelson was appointed to assist Mr. Fred Lind at the time of the Rule 24 hearing, seven months before trial, at which it was determined that defendant was to be tried capitally. Gen. R. Pract. Super. and Dist. Ct. 24, 1999 Ann. R. N.C. 22. The appointment of Mr. Harrelson at that early stage ensured that both attorneys representing the indigent defendant would have enough time to effec-

tively prepare for trial. Thus, the trial court properly complied with the statute and did not err by permitting the trial to continue when one of the appointed attorneys left the courtroom.

Furthermore, while our careful examination of the transcript reveals that Mr. Harrelson left the courtroom several times throughout the trial, the longest of these absences was just four minutes. During several of these absences, court was in recess or held at ease; during every absence of Mr. Harrelson, defendant was represented by Mr. Lind, who was present in the courtroom. This assignment of error is feckless.

[7] By another assignment of error, defendant contends that the trial court erred in allowing Tshamba Wynn to testify about what Wynn's attorney, Robert O'Hale, told him regarding defendant, the pending murder trial, and defendant's counsel. Shortly after the murder, Wynn was arrested while driving the victim's car. He testified that defendant had given him the keys to the stolen car. Several months later, Wynn was arrested on an unrelated charge and was placed in the same Guilford County jail cell as defendant. Wynn testified that while he was in the jail cell, defendant threatened him and then coerced him into signing a note prepared by defendant, which indicated that a third person had threatened Wynn.

Wynn testified that the next time he saw the note was when he met his court appointed attorney, Mr. O'Hale, who had the note with him when they met for the first time. During their meeting, they discussed Wynn's case briefly and then spent the remainder of the time talking about this murder case. Wynn testified that Mr. O'Hale told him that he was a friend of defendant's attorneys. Mr. O'Hale said that defendant's attorneys wanted him to find out what Wynn would say if he was called to testify for the State. Wynn also testified that Mr. O'Hale asked his permission to reveal any information Wynn gave him to defendant's attorneys. Defendant's objections to these statements were overruled by the trial court. However, the trial court instructed the jury not to consider Wynn's testimony about Mr. O'Hale for the truth of what was said to Wynn, but only "inasmuch as the statement showed why [Wynn] took subsequent actions." Defendant maintains that the State failed to introduce any evidence that Wynn took any subsequent actions in response to this statement. Therefore, defendant argues, this testimony was inadmissible hearsay and not subject to any exception under the hearsay rule. Defendant contends that because Wynn testified that defendant's counsel had asked

Wynn's attorney to violate the attorney-client relationship, the impact of this evidence was to portray defendant's counsel as being unethical and deceitful. Defendant says that this undermined his counsel's credibility and effectiveness in representing him, thereby denying him his due process rights to a fair trial.

The North Carolina Rules of Evidence define hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." N.C.G.S. § 8C-1, Rule 801(c) (1992). However, out of court statements offered for purposes other than to prove the truth of the matter asserted are not considered hearsay. This Court has held that statements of one person to another to explain subsequent actions taken by the person to whom the statement was made are admissible as nonhearsay evidence. *State v. Morston*, 336 N.C. 381, 399, 445 S.E.2d 1, 11 (1994); *see also State v. Coffey*, 326 N.C. 268, 282, 389 S.E.2d 48, 56 (1990).

In the present case, the trial court allowed Wynn's testimony for the limited purpose of explaining why Wynn reacted to the note as he did and his subsequent conduct in testifying for the State rather than for defendant. Wynn's testimony about his conversation with Mr. O'Hale was necessary to explain the coercive circumstances under which the note was signed and why Wynn refused to testify in accordance with the note. We conclude that Wynn's testimony was proper nonhearsay evidence when introduced for that limited purpose.

We also conclude that defendant suffered no prejudice from this testimony. Although, according to Wynn, defendant's counsel sought to find out what Wynn would testify to in court, there is no evidence that defendant's counsel tried to influence Wynn to give false testimony. Furthermore, contrary to defendant's contention, there is no evidence that Wynn's attorney, Mr. O'Hale, violated the attorney-client privilege by revealing any information concerning Wynn to defendant's attorneys. Thus, there was no wrongdoing that could be attributed to defendant's counsel. This assignment of error is without merit.

[8] By another assignment of error, defendant contends that he was denied due process of law when the trial court denied his motion to require the State to provide him with the criminal records of all of the prosecution witnesses. Defendant maintains that the credibility of the witnesses was crucial and that the records were necessary for impeachment purposes. Although many of the prosecution witnesses

did testify about their criminal history, defendant claims that without their criminal records, whether they testified truthfully or completely cannot be known.

We have previously decided this question in *State v. Carter*, 326 N.C. 243, 388 S.E.2d 111 (1990). In *Carter*, the defendant's counsel searched the records in the office of the Clerk of Superior Court but found no convictions that would help him in impeaching the witnesses for the State. The defendant then requested that the trial court "order the district attorney to share its allegedly unique access to the 'Police Information Network' ('P.I.N.') system." *Id.* at 253, 388 S.E.2d at 117. The trial court denied the request. This Court, finding no error, held that "defendant had neither the statutory nor the constitutional right to the information he sought." *Id.*; *see also State v. Alston*, 307 N.C. 321, 338, 298 S.E.2d 631, 643 (1983) ("The trial court is without authority to grant such a request and the failure of the court to order the disclosure of the State's witnesses' criminal records is not violative of due process."). We have said that in some cases, withholding such information can deny a defendant due process. However,

> [t]o establish a denial of due process defendant would have had to show (1) that [the witness] *had* a significant record of degrading or criminal conduct; (2) that the impeaching information sought was *withheld* by the prosecution; and (3) that its disclosure considered in light of all the evidence would have created a reasonable doubt *of his guilt* which would not otherwise exist.

*State v. Robinson*, 310 N.C. 530, 536, 313 S.E.2d 571, 576 (1984) (emphasis added) (quoting *State v. Ford*, 297 N.C. 144, 149, 254 S.E.2d 14, 17 (1979)).

Our careful examination of the record in this case discloses that the prosecution witnesses were cross-examined rigorously and extensively by both defense attorneys. Both successfully elicited testimony from the witnesses on cross-examination about their various past criminal convictions including drug possession and sale of drugs, breaking and entering, and larceny. There was ample evidence presented to the jury for impeachment purposes. We fail to see how any additional impeaching evidence gleaned from the criminal records of these witnesses would have created a reasonable doubt of defendant's guilt which did not otherwise exist. *Id.* We therefore conclude that defendant's due process rights were not violated. Accordingly, this assignment of error is overruled.

STATE v. THOMAS

[350 N.C. 315 (1999)]

Defendant next argues that the trial court erred in denying his motions for a mistrial based on the testimony of one of the State's witnesses and the prosecutor's misstatement during the questioning of defendant. During cross-examination, Officer Brian Dodd referred to an unrelated armed robbery charge against defendant. Defendant's objection was sustained, and the trial court instructed the jury to disregard the statement. Later, during cross-examination of defendant concerning his convictions for two prior robberies, the prosecutor mistakenly referred to the prior convictions as "two murders." In this instance, the trial court did not issue a curative instruction to the jury. Defendant contends that pursuant to N.C.G.S. § 15A-1061, he was entitled to a mistrial because this inadmissible evidence and improper questioning by the prosecutor was highly inflammatory and prejudiced his case. We disagree.

The relevant statute here directs the trial court to declare a mistrial upon the defendant's motion if there occurs during the trial an error or conduct inside or outside the courtroom that results in substantial and irreparable prejudice to the defendant's case. N.C.G.S. § 15A-1061 (1997). It is well established that the decision as to whether substantial and irreparable prejudice has occurred lies within the sound discretion of the trial judge and that his decision will not be disturbed on appeal absent a showing of abuse of discretion. *State v. McNeill*, 349 N.C. 634, 646, 509 S.E.2d 415, 422 (1998). The decision of the trial judge is entitled to great deference since he is in a far better position than an appellate court to determine the effect of any such error on the jury. *State v. King*, 343 N.C. 29, 44, 468 S.E.2d 232, 242 (1996). Applying these principles, we reject defendant's contention that the trial court erred by failing to declare a mistrial.

[9] First, regarding Officer Dodd's testimony about defendant's unrelated armed robbery charge, we note that the trial court sustained defendant's objection, allowed his motion to strike, and instructed the jury to disregard the statement. Because the trial court cured any error by its action in sustaining the objection and giving the curative instruction, we find no prejudice to defendant warranting a mistrial. *See State v. Bowie*, 340 N.C. 199, 209, 456 S.E.2d 771, 776, *cert. denied*, 516 U.S. 994, 133 L. Ed. 2d 435 (1995).

[10] Next, we examine the prosecutor's questioning of defendant as follows:

Q  My question to you, sir, is, why did you come back to Guilford County?

A  Because I had to go to court for two common law robberies.

Q  And those court dates were in fact in 1996, weren't they, sir?

[DEFENSE COUNSEL]:  Objection.

THE COURT:  Overruled.

A  The court dates was in '95, Mr. Panosh, August the 22nd of 19— August the 17th—August the 24th of 1995, was when I had the court dates. I did not have no common-law robbery court dates in 1996.

. . . .

Q  Isn't it a fact, sir, that you appeared on October the 17th of 1995—

[DEFENSE COUNSEL]:  Objection.

Q  —and pled guilty—

THE COURT:  Overruled.

Q  —to those two murders?

[DEFENSE COUNSEL]:  Objection.

THE COURT:  Overruled.

A  I didn't never pled guilty to two murders.

[DEFENSE COUNSEL]:  Move to Strike. Motion for a mistrial.

Q  You pled guilty to those two—

THE COURT:  Motion denied.

Q  —common-law robberies?

Although no curative instruction was given by the trial court in this instance, defendant did not request that one be given. We have held that "[a] trial court does not err by failing to give a curative jury instruction when, as here, it is not requested by the defense." *State v. Williamson*, 333 N.C. 128, 139, 423 S.E.2d 766, 772 (1992). Moreover, defendant himself denied that he had pled guilty to "two murders." We also note that it is obvious that the prosecutor simply misspoke and quickly corrected himself. Defendant has failed to show that this

slip of the tongue prejudiced his case. We therefore conclude that the trial court did not abuse its discretion in denying defendant's motions for a mistrial and find this assignment of error to be without merit.

By four assignments of error, defendant challenges the sufficiency of the evidence presented in support of his robbery with a dangerous weapon, first-degree kidnapping, and first-degree burglary convictions. To withstand a motion to dismiss, "the trial court need only determine whether there is substantial evidence of each essential element of the crime and that the defendant is the perpetrator." *State v. Call*, 349 N.C. 382, 417, 508 S.E.2d 496, 518 (1998). The trial court must examine the evidence in the light most favorable to the State, giving the State the benefit of all reasonable inferences. *Id.* "Circumstantial evidence may withstand a motion to dismiss and support a conviction even when the evidence does not rule out every hypothesis of innocence." *State v. Stone*, 323 N.C. 447, 452, 373 S.E.2d 430, 433 (1988). We will apply the foregoing principles to each of defendant's contentions in turn.

[11] Defendant first contends that the evidence was insufficient to prove that he committed the crime of robbery with a dangerous weapon. The elements of this offense are an unlawful taking or an attempt to take personal property from the person or in the presence of another, by use or threatened use of a firearm or other dangerous weapon, whereby the life of a person is endangered or threatened. N.C.G.S. § 14-87 (1993). Defendant argues that the evidence presented that the victim's stolen property was found in his possession is insufficient to give rise to the reasonable inference that he took the stolen items from the victim's person. Defendant further argues that the insufficiency of the evidence to support a conviction for robbery with a dangerous weapon undermines his conviction for first-degree murder based on the felony murder rule, entitling him to a new trial. Defendant also asserts that he is entitled to a new sentencing hearing because robbery was an aggravating circumstance found by the jury.

[12] The evidence at trial tended to show that defendant was seen at a sports bar located just a couple of hundred feet from where the victim lived. His palm print was found on the stove in the victim's home. He was seen driving the victim's car and using the victim's automatic-teller machine card shortly before the victim's body was discovered. Further, the victim's clothing and other items of stolen property were seized from defendant's room. Taken in the light most favorable to the State, we conclude that there was sufficient evidence to give rise

to a reasonable inference that defendant murdered Tuttle and stole the property while Tuttle was bound and bleeding to death in the kitchen. Furthermore, defendant was convicted of first-degree murder not only on the basis of the felony murder rule but also on the basis of premeditation and deliberation. We have previously held that where a defendant is convicted of murder on the theory of premeditation and deliberation supported by the law and the facts, he has suffered no prejudice by the submission to the jury of an alternate theory. *State v. Barnard,* 346 N.C. 95, 108-09, 484 S.E.2d 382, 390 (1997). Finally, the felony underlying a conviction for felony murder may be submitted as an aggravating circumstance under N.C.G.S. § 15A-2000(e)(5) if the defendant is also convicted of first-degree murder on the basis of premeditation and deliberation. *See State v. McNeill,* 346 N.C. 233, 241, 485 S.E.2d 284, 289 (1997), *cert. denied,* —— U.S. ——, 139 L. Ed. 2d 647 (1998). Since the jury found defendant guilty of first-degree murder under both theories, the trial court did not err in submitting the (e)(5) aggravating circumstance. Thus, we find no merit to defendant's argument.

[13] Next, defendant contends that the trial court erred by denying his motion to dismiss the first-degree kidnapping charge because there was insufficient evidence that the restraint of the victim was separate and apart from the restraint inherent in the commission of the armed robbery. Defendant also argues that this Court must arrest judgment on the kidnapping charge. We disagree.

N.C.G.S. 14-39(a) provides:

> (a) Any person who shall unlawfully confine, restrain or remove from one place to another, any other person 16 years of age or over without the consent of such person, or any other person under the age of 16 years without the consent of a parent or legal guardian of such person, shall be guilty of kidnapping if such confinement, restraint, or removal is for the purpose of:
>
> . . . .
>
> (2) Facilitating the commission of any felony or facilitating flight of any person following the commission of a felony . . . .

N.C.G.S. § 14-39(a)(2) (1998).

"Restraint" in our kidnapping statute "connotes a restraint separate and apart from that inherent in the commission of the other

felony. . . . The key question is whether the victim is exposed to greater danger than that inherent in the armed robbery itself or 'subjected to the kind of danger and abuse the kidnapping statute was designed to prevent.' " *State v. Johnson*, 337 N.C. 212, 221, 446 S.E.2d 92, 98 (1994) (quoting *State v. Irwin*, 304 N.C. 93, 103, 282 S.E.2d 439, 446 (1981)).

In this case, the victim was found lying on the floor with his hands tied behind his back. In addition, the victim had an apron tied around his neck and several towels and a stuffed toy around his mouth and face. The elements of armed robbery do not require that defendant bind and gag the victim in such a manner. Furthermore, the evidence tended to show that the victim was repeatedly stabbed and cut while he was restrained, and thus he "was subjected to the kind of danger and abuse the kidnapping statute was designed to prevent." *Id.* We conclude that there was ample evidence of restraint not inherent in the armed robbery to support the charge of kidnapping. This assignment of error is overruled.

[14] Finally, defendant contends that the trial court erred by denying his motion to dismiss the charge of first-degree burglary because there was insufficient evidence of the element of "breaking" to establish the crime of burglary. Defendant also asserts that he is entitled to a new sentencing hearing because burglary was an aggravating circumstance found by the jury. Once again, we find no merit to defendant's contention.

The indictment for burglary alleged that defendant did unlawfully and feloniously break and enter the dwelling of the victim in the nighttime with the intent to commit a felony, larceny, or robbery therein. *See* N.C.G.S. § 14-51 (1993). "A breaking may be actual or constructive." *State v. Wilson*, 289 N.C. 531, 539, 223 S.E.2d 311, 316 (1976). In this case, the State presented evidence that there was a constructive breaking accomplished by deception or trick. *See State v. Oliver*, 334 N.C. 513, 529, 434 S.E.2d 202, 210 (1993). The State relied on the testimony of Mary Blue, who had been assaulted and robbed by defendant after he tricked his way into her house, to establish defendant's *modus operandi*. She testified that defendant rang her doorbell and asked to use the phone to get help because his car had broken down. Once inside the kitchen, he asked for the telephone book and a glass of water. In the present case, defendant testified to being in the victim's kitchen to drink a glass of water. The police found a telephone book opened to the taxicab pages. A cab

company had received a call at about the time of the murder requesting that a cab come to the victim's address. Ms. Blue testified that defendant had stabbed her in the neck with a knife taken from her kitchen. In the present case, Tuttle was stabbed in the neck with a knife taken from his kitchen. Finally, in both offenses, the victim's wallet or pocketbook was stolen. Viewed in the light most favorable to the State, this evidence permitted the inference that defendant tricked his way into Tuttle's house in the same manner that he tricked his way into Ms. Blue's house.

In addition, there was other evidence that defendant had been inside Tuttle's residence. Defendant testified that he did not know Tuttle but that he had been in his home. Defendant testified that he had been in the kitchen because he had asked Tuttle for a drink of water, and defendant's palm print was found on the stove in the kitchen. Therefore, we conclude that there is sufficient evidence of a constructive breaking to sustain defendant's burglary conviction. We overrule this assignment of error.

In seven assignments of error, defendant contends that the trial court erred by refusing to give particular jury instructions which he asserts were supported by the evidence and in conformity with the law. For the following reasons, we find no error in the trial court's failure to give the instructions requested by defendant.

[15] First, defendant contends that the trial court committed reversible error by denying his request to instruct the jury on second-degree murder as a lesser included offense of first-degree murder. Because there was no confession by defendant and no eyewitness to the exact circumstances of Tuttle's murder, defendant argues the jury could have found that the State failed to prove that he killed the victim after premeditation and deliberation.

First-degree murder is the intentional and unlawful killing of a human being with malice and with premeditation and deliberation. *State v. Taylor*, 337 N.C. 597, 607, 447 S.E.2d 360, 367 (1994). Second-degree murder is the unlawful killing of a human being with malice but without premeditation and deliberation. *State v. Flowers*, 347 N.C. 1, 29, 489 S.E.2d 391, 407 (1997), *cert. denied*, —— U.S. ——, 140 L. Ed. 2d 150 (1998). "A defendant is entitled to have a lesser-included offense submitted to the jury only when there is evidence to support that lesser-included offense." *Id.* "If the State's evidence establishes each and every element of first-degree murder and there is no evidence to negate these elements, it is proper for

the trial court to exclude second-degree murder from the jury's consideration." *Id.*

Here, defendant contends that the jury could reasonably have concluded that defendant killed the victim with malice but without premeditation and deliberation. Premeditation involves a specific intent to kill, however short, formed before the actual killing. *Taylor*, 337 N.C. at 607, 447 S.E.2d at 367. Deliberation means an intent to kill, carried out in a cool state of blood, in furtherance of a fixed design for revenge or to accomplish an unlawful purpose and not under the influence of a violent passion, suddenly aroused by legal provocation or lawful or just cause. *Id.* Because premeditation and deliberation are mental processes and often are not supported by direct evidence, we have set out some of the many circumstances from which they may be inferred:

> (1) absence of provocation on the part of the deceased, (2) the statements and conduct of the defendant before and after the killing, (3) threats and declarations of the defendant before and during the occurrence giving rise to the death of the deceased, (4) ill will or previous difficulties between the parties, (5) the dealing of lethal blows after the deceased has been felled and rendered helpless, (6) evidence that the killing was done in a brutal manner, and (7) the nature and number of the victim's wounds.

*State v. Sierra*, 335 N.C. 753, 758, 440 S.E.2d 791, 794 (1994).

In this case, the evidence tended to show that defendant entered Tuttle's home by trick and attacked him without provocation. The evidence also tended to show that Tuttle was bound and helpless during the murder. Tuttle suffered thirty-six stab wounds to his body inflicted with a butcher knife, many of which the coroner testified had been inflicted while Tuttle was still alive, showing the brutality of the killing. We conclude that this evidence is sufficient to satisfy the State's burden of proving premeditation and deliberation. Furthermore, the only evidence offered by defendant to negate first-degree murder was his own testimony denying his involvement in the crime, which alone does not tend to negate premeditation and deliberation. *See Morston*, 336 N.C. at 402-03, 445 S.E.2d at 13; *State v. Johnson*, 317 N.C. 193, 205, 344 S.E.2d 775, 782 (1986). Thus, the evidence in this case would not permit a jury to find defendant guilty of second-degree murder. Accordingly, we reject this assignment of error.

[16] Next, defendant contends that the trial court committed reversible error by failing to instruct the jury on second-degree burglary as a permissible lesser included offense of first-degree burglary. At the outset, we note that defendant did not request such an instruction at trial and therefore is entitled to review only for plain error. N.C. R. App. P. 10(c)(4). In order to prevail under the plain error rule, defendant must convince this Court that there was error and that absent the error, the jury probably would have reached a different verdict. *State v. Jordan*, 333 N.C. 431, 440, 426 S.E.2d 692, 697 (1993). Defendant cannot meet this heavy burden.

Second-degree burglary has elements identical to first-degree burglary, except actual occupation of the residence at the time of the commission of the crime is not required. N.C.G.S. § 14-51. Defendant argues that the State presented no direct evidence that the victim's residence was actually occupied at the time that defendant entered. In support of his argument, defendant relies on the testimony of two witnesses. As stated earlier, Wilson drove with defendant to the sports bar the night of the murder. After waiting a long time in the car for defendant, Wilson went to the bar one last time looking for him and was told that defendant had left fifteen minutes earlier. On direct examination, when asked what time this was, Wilson responded, "I guess at least 10:00 o'clock, I guess." Wilson also testified that he saw defendant "about one hour later," driving the victim's car. Also, Robert McFayden, a friend of the victim's, testified that on the night of the murder, the victim left his house at approximately 11:30 p.m. There was no direct evidence of exactly when the victim arrived home. According to defendant, these times would indicate that he left to walk to the victim's house, which was only a few hundred feet from the sports bar, at approximately 10:00 p.m., committed the crimes and returned to see Wilson, all by 11:30 p.m., making it possible that the victim's house was not occupied at the time of the breaking and entering.

However, our careful reading of the transcript does not support defendant's argument. On cross-examination, Wilson was confronted with the conflicting statement he gave the police in which he stated that he had waited at the sports bar for defendant until 1:30 or 2:00 o'clock in the morning. He responded, "I might have said it. But like I say, nobody had no watch on, but it was pretty late when we left, because we waited and waited for [defendant]." Furthermore, Wilson's friend Rabbit, who accompanied Wilson and defendant that night, testified that he and Wilson left the bar at "probably after 12:00

a.m." Also, the bartender at the sports bar testified that defendant left the bar at about 1:30 a.m.

Moreover, the State presented evidence tending to show that Tuttle was home at the time that defendant broke into and entered his residence. Tuttle left his friend's house at 11:30 p.m. The cab driver testified that when he arrived at Tuttle's house after 2:00 a.m., there was a blue or gray car in the driveway, which was later determined to be Tuttle's car. When Tuttle's roommate returned home later that morning and discovered Tuttle's body, he noticed that Tuttle's car was gone. All of this evidence tended to show that Tuttle was actually occupying his residence when defendant broke into the victim's home and entered it to rob and murder him. In light of the foregoing evidence, we conclude that defendant cannot show that the jury probably would have reached a different verdict, even if the trial court had instructed it on the lesser-included offense of second-degree burglary. This assignment of error is meritless.

[17] Next, defendant contends that the trial court committed reversible error in failing to properly instruct the jury on the probative value of fingerprint or palm print evidence. As to how his left palm print came to be found on the stove in the victim's kitchen, defendant testified that he had been inside the victim's house the night of the murder. He said that he had impressed his palm print on the stove when he went into the kitchen to get a glass of water, but that when he left, the victim was still alive.

Prior to the charge conference, defendant made a written request for a special jury instruction to inform the jury that the fingerprint or palm print of the defendant are "without probative force unless the circumstances show that they could have only been impressed at the time the crime was committed." The State filed its own request for an instruction. During the charge conference, the trial court stated, "I believe both of them are accurate statements of the law, and I'll give them both." The combination of the two instructions was given to the jury as follows:

Now, fingerprints or palmprints corresponding to those of the defendant are without probative force, unless the circumstances show that they could only have been impressed at the time the crime was committed. If a qualified expert finds that fingerprints found at the scene correspond with the fingerprints of the defendant, and when considered with all the other evidence of the case, you find substantial evidence of circumstances that the

**STATE v. THOMAS**

[350 N.C. 315 (1999)]

fingerprints were impressed at or about the time these crimes were committed, then it would be evidence which logically tends to show that the accused was present and participated in the commission of the crimes. Now, what the evidence proves or fails to prove . . . is a question of fact for you, the jury.

Defendant admits that the first part of the instruction was as he requested, but argues that the second part of the instruction was inconsistent with the first. Specifically, defendant complains that if the jury found from "substantial evidence of circumstances that the fingerprints were impressed *at or about* the time these crimes were committed," it would allow the jury to convict him even if the jury believed his innocent explanation for how his palm print had been impressed at the victim's house. Defendant relies on *State v. Bradley*, 65 N.C. App. 359, 309 S.E.2d 510 (1983), in support of his argument. However, the present case is distinguishable from *Bradley*.

In *Bradley*, the State relied primarily on a latent palm print of the defendant's found on a windowpane to prove that the defendant committed larceny. Despite expert testimony that the palm print could have remained on the window for six months, the trial court failed to give the jury an instruction on the limited circumstances under which the palm print would be sufficient to support a conviction. In the present case, in addition to defendant's palm print, the State presented substantial circumstantial evidence tending to prove defendant's guilt, including defendant's proximity to the victim's house on the night of the murder, the telephone call to the cab company placed from the victim's house, the victim's car and other personal items found in defendant's possession, and the videotape of defendant using the victim's automatic-teller machine card. Furthermore, here, the jury *was* instructed on the probative effect of palm print evidence, just as defendant requested. We note also that defendant initially denied being in the victim's house and changed his story only *after* the evidence of the palm print was presented by the State. It was a matter for the jury to decide whether to believe the State's or defendant's explanation of how and when defendant's palm print was left in the victim's kitchen. Based on the evidence, the trial court's instruction was proper. We find no merit to defendant's argument.

[18] Defendant next assigns as error the trial court's instructions on the use and effect of circumstantial evidence. Defendant requested the following instruction:

> Circumstantial evidence will support a conviction when, and only when, the circumstances are sufficient to exclude every reasonable hypothesis except that of guilt. To meet this requirement, the circumstantial facts must be consistent with the hypothesis that the accused is guilty, and at the same time inconsistent with the hypothesis that he is innocent.

The trial court declined to give this instruction and instead informed the jury that the law makes no distinction between the weight to be given either circumstantial or direct evidence and that "[a]fter weighing all the evidence if you're not convinced of the guilt of the defendant beyond a reasonable doubt, you must find him not guilty." Defendant asserts that the trial court's failure to instruct that the circumstantial evidence must be inconsistent with innocence was error. We disagree.

The instructions on circumstantial evidence given to the jury in this case were taken directly from North Carolina's pattern jury instructions. *See* N.C.P.I.—Crim. 104.05 (1986). Moreover, we have previously held that such instructions are proper. *See State v. Moore*, 335 N.C. 567, 607, 440 S.E.2d 797, 820 (instructions identical to those given in this case), *cert. denied*, 513 U.S. 898, 130 L. Ed. 2d 174 (1994); *see also Stone*, 323 N.C. at 452, 373 S.E.2d at 433 ("Circumstantial evidence may withstand a motion to dismiss and support a conviction even when the evidence does not rule out every hypothesis of innocence."); *State v. Adcock*, 310 N.C. 1, 33, 310 S.E.2d 587, 606 (1984) ("Our research discloses that both state and federal courts are increasingly abandoning the requirement that there be special instructions on proof of guilt by circumstantial evidence."). We conclude that the trial court did not err in refusing to instruct the jury in the language requested by defendant.

[19] By his next assignment of error regarding jury instructions, defendant contends that the trial court committed plain error in instructing the jury on the doctrine of possession of recently stolen property. Defendant claims that during the first part of the instruction the trial court implied that "the mere physical proximity or the mere fact that an article is found in a certain place under the dominion and control of the defendant would be sufficient to merit or trigger the inference of the doctrine of possession of recently stolen property." Although defendant concedes that the trial court later recognized and corrected any error, he still contends that the effect of the instruction was to place the burden on defendant to rebut the presumption of

guilt. Defendant asserts this was a fundamental error entitling him to a new trial. We find no merit to this argument.

The relevant portion of the trial court's instructions was as follows:

> [T]he defendant's physical proximity, if any, to the article *does not by itself* permit an inference that the defendant was aware of its presence or had the power or intent to control its disposition or its use. (Emphasis added). Later, *sua sponte*, the trial court repeated:

> *[T]he mere fact of physical proximity* and the mere fact that an article is found in a certain place, and that the defendant exercised control over that place, *those facts alone do not merit or warrant an inference*. There must be other circumstances, in addition to that, before you can make such an inference.

(Emphasis added.) These were proper instructions, and we fail to see how they could have carried the implication that defendant now says they carried. This assignment of error is overruled.

[20] Next, defendant contends that the trial court committed plain error in instructing the jury on first-degree kidnapping by including an allegation from the indictment not supported by the evidence. In the indictment, defendant was charged, *inter alia*, with first-degree kidnapping wherein the State alleged that "[t]he victim was not released in a safe place but was killed by [defendant]." The trial court instructed that "the State must prove beyond a reasonable doubt that the person was not released by the defendant in a safe place." Defendant claims that the evidence in this case is that the victim never left his house and was in fact killed in his house. He contends that because the victim had not been removed from one place and taken to another, the element of failure to release the victim in a safe place was not supported by the evidence. We find this instruction to be proper. Kidnapping does not necessarily require that the victim be "removed"; kidnapping may also be accomplished by confining or restraining the victim. *See* N.C.G.S. § 14-39(a). A kidnapping in the first degree is committed if, *inter alia*, "the person kidnapped either was not released by the defendant in a safe place or had been seriously injured or sexually assaulted." N.C.G.S. § 14-39(b). Further, the element of failure to release in a safe place applies to a kidnapping by restraint and confinement and not just to kidnapping by removal, as defendant seems to suggest.

In the case at bar, the evidence tended to show that kidnapping was accomplished by restraint of the victim. As the victim was found stabbed to death, with his hands still tied behind his back with a telephone cord, he most certainly was never released from this restraint in a safe place.

[21] By this same argument, defendant contends that should this Court find that the kidnapping instruction was supported by the evidence, the trial court erred in instructing on first-degree kidnapping as the underlying felony for felony murder. Defendant argues that because the murder of the victim is the only evidence to support the "serious injury" element of first-degree kidnapping, his convictions and sentencing for both first-degree kidnapping and felony murder subject him to double punishment and violate the prohibition against double jeopardy.

As noted above, defendant's conviction of first-degree kidnapping was based on the element that he did not "release the victim in a safe place," and *not*, as defendant suggests, based on the element of "serious injury." Furthermore, defendant's first-degree murder conviction was based not only on the felony murder rule, but also on premeditation and deliberation. "Where the conviction of a defendant for first-degree murder is based upon proof of malice, premeditation and deliberation, proof of an underlying felony—although that felony be part of the same continuous transaction—is *not* an essential element of the state's homicide case, and the defendant *may* therefore be sentenced upon both the murder conviction and the felony conviction." *State v. Goodman*, 298 N.C. 1, 15, 257 S.E.2d 569, 579 (1979). In addition, defendant was convicted under the felony murder rule not only on the basis of first-degree kidnapping, but also on the basis of first-degree burglary and robbery with a dangerous weapon. For these reasons, we reject defendant's arguments.

[22] In another assignment of error, defendant contends that the trial court committed reversible error by allowing the prosecutor to read facts of another, unrelated case to the jury during closing arguments. The pertinent portion of the argument follows:

[PROSECUTOR]: 'A constructive breaking, as distinguished from an actual forcible breaking, occurs when entrance to the dwelling is accomplished through fraud, deception or threatened violence.' Quoting a case called *State v. Young* from our Supreme Court from 1985, 'In the instant case, the State presented evi-

dence that the defendant and two others went to the victim's home on the night—'

[DEFENSE COUNSEL]: Objections to facts of another case.

[PROSECUTOR]: '—8 of February 1983—'

THE COURT: Excuse me?

[DEFENSE COUNSEL]: Objection to facts of another case.

THE COURT: Overruled.

[PROSECUTOR]: '—intending to commit the felonies of armed robbery and murder. The victim was tricked into opening the door by Dwight Jackson's false statement that he and his friends had come to purchase liquor from the victim.' . . . [I]n this regard, you can consider the evidence of Ms. Mary Blue, how she was tricked by the defendant, how he said, "I need to call—" "I need to use the phone," or "I need a glass of water." And I submit to you that's exactly what happened in this case . . . [Defendant] came to Mr. Tuttle's home, and the front porch light was on. And I submit and contend to you he did exactly what he did to Ms. Blue, he knocked on the door, and he tricked Mr. Tuttle into letting him in.

Defendant argues that it was improper for the prosecutor to argue facts of another case in an effort to explain to the jury his theory that defendant entered the victim's home by trickery in the present case. Defendant contends that the trial court's failure to correct this impropriety entitles him to a new trial.

In all superior court jury trials, "the whole case as well of law as of fact may be argued to the jury." N.C.G.S. § 7A-97 (1995). We have previously reviewed the scope of a party's right under this statute:

[This statute] grants counsel the right to argue the law to the jury which includes the authority to read and comment on reported cases and statutes. *State v. Irick*, 291 N.C. 480, 231 S.E.2d 833 (1977). There are, however, limitations on what portions of these cases counsel may relate. For instance, counsel may only read statements of the law in the case which are relevant to the issues before the jury. In other words, "the whole *corpus juris* is not fair game." *State v. McMorris*, 290 N.C. 286, 287, 225 S.E.2d 553, 554 (1976). Secondly, counsel may not read the facts contained in a published opinion together with the result to

imply that the jury in his case should return a favorable verdict for his client. *Wilcox v. [Glover Motors, Inc.]*, 269 N.C. 473, 153 S.E.2d 76 (1967). Furthermore, counsel may not read from a dissenting opinion in a reported case. *See Conn v. [Seaboard Air Line Ry.* Co.], 201 N.C. 157, 159 S.E. 331 (1931).

*State v. Gardner*, 316 N.C. 605, 611, 342 S.E.2d 872, 876 (1986).

In support of his contention, defendant erroneously relies on *Gardner*, where this Court upheld the trial court's decision to not allow the defense to read an excerpt to the jury. However, *Gardner* is distinguishable from the present case. In *Gardner*, the material the defendant sought to read to the jury was contrary to the law in North Carolina and was quoted from sources which were not proper, including a dissenting opinion from another jurisdiction. The excerpt also involved an issue which did not arise from the evidence in the defendant's trial. In the present case, the portion of the prosecutor's argument complained of by defendant not only accurately stated the law of North Carolina, but also concerned principles of law which were relevant to an issue arising in this case, the constructive breaking element of burglary. We conclude that the trial court did not err by allowing the prosecutor to read to the jury the above mentioned excerpt since the principles contained therein were relevant to the evidence and the issues of this case.

[23] In defendant's final assignment of error in the guilt-innocence phase of his trial, he argues that the trial court denied him his due process rights to a fair trial as guaranteed by the federal and state Constitutions by allowing a witness to testify regarding a prior violent assault. As we have already discussed, Ms. Blue testified that defendant had tricked his way into her house and assaulted her. Defendant claims that this evidence was so "graphic and disturbing" that it could only have been considered by the jury for the impermissible purpose of establishing defendant's propensity to commit the crimes in the present case. Further, defendant contends that the dissimilarities between the assault on Ms. Blue and the crimes in this case were so significant that the probative value of the evidence was outweighed by the prejudicial effect.

Rule 404(b) of the North Carolina Rules of Evidence provides, in pertinent part:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in

conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident.

N.C.G.S. § 8C-1, Rule 404(b) (1992). Furthermore, as we have previously stated:

> "This rule is 'a clear general rule of *inclusion* of relevant evidence of other crimes, wrongs or acts by a defendant, subject to but *one exception* requiring its exclusion if its *only* probative value is to show that the defendant has the propensity or disposition to commit an offense of the nature of the crime charged.' *State v. Coffey*, 326 N.C. [268,] 278-79, 389 S.E.2d [48,] 54 [(1990)]. The list of permissible purposes for admission of 'other crimes' evidence is not exclusive, and such evidence is admissible as long as it is relevant to any fact or issue other than the defendant's propensity to commit the crime."

*State v. Pierce*, 346 N.C. 471, 490, 488 S.E.2d 576, 587 (1997) (quoting *State v. White*, 340 N.C. 264, 284, 457 S.E.2d 841, 852-53, *cert. denied*, 516 U.S. 994, 133 L. Ed. 2d 436 (1995)) (alterations in original).

We note first that the similarity between a prior crime or act and the charged crime need not "rise to the level of the unique and bizarre" in order for the evidence to be admitted under Rule 404(b). *State v. Stager*, 329 N.C. 278, 304, 406 S.E.2d 876, 891 (1991). As we have outlined earlier in this opinion, there were many similarities between the assault committed by defendant on Ms. Blue and the crimes for which defendant was tried in this case. After conducting a *voir dire*, the trial court found these similarities to have probative value and that the evidence tended to prove relevant facts, including the motive for the burglary, the method of nonforcible entry into the home, the intent of the killer to commit a robbery, the specific intent to kill, a specific plan or design to commit the burglary, robbery, and murder, and a pattern of behavior tending to show that defendant committed both crimes. These are all permissible purposes for which evidence may be offered under Rule 404(b).

In addition, there were four dissimilarities found by the trial court. Specifically, the victim in this case was bound with a telephone cord and Ms. Blue was not. Ms. Blue was assaulted with a handgun and the victim here was not. Ms. Blue is a middle-aged black female, and the victim in this case was a young white male. Further, the vic-

tim here was not acquainted with defendant, while Ms. Blue was. The trial court concluded that these dissimilarities were not so significant as to prevent the evidence of the prior assault from being probative and admissible under Rule 404(b). In its written order, the trial court noted that "the fact that Ms. Blue was not bound, for example, merely explains why she is able to be present and testify." We find no error in the trial court's ruling.

We also find no merit to defendant's contention that the probative value of this evidence was outweighed by the danger of unfair prejudice. Rule 403 of the North Carolina Rules of Evidence provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

N.C.G.S. § 8C-1, Rule 403 (1992). Any evidence tending to prove a defendant guilty will necessarily be prejudicial to his case; the question is one of degree. *State v. Wilson*, 345 N.C. 119, 127, 478 S.E.2d 507, 512-13 (1996). The trial court must balance the probative value of the evidence against its prejudicial effect, and the determination of whether to exclude the evidence under Rule 403 is a matter within the sound discretion of the trial court. *State v. Mickey*, 347 N.C. 508, 518, 495 S.E.2d 669, 676, *cert. denied*, —— U.S. ——, 142 L. Ed. 2d 106 (1998). Here, the trial court ruled that the probative value of this evidence outweighed any prejudicial effect. We conclude that the trial court did not abuse its discretion by admitting Ms. Blue's testimony into evidence. Accordingly, we reject this assignment of error.

For the foregoing reasons, we conclude that defendant's trial on all charges against him was free of prejudicial error.

## CAPITAL SENTENCING PROCEEDING

[24] By an assignment of error, defendant contends that during the separate capital sentencing proceeding held after the jury convicted him of first-degree murder, the trial court erred by allowing the testimony of Terry Ray Cook, the mortician who prepared the body of the victim for burial. The prosecutor sought to elicit testimony from Mr. Cook that the victim had been forcibly gagged to establish the especially heinous, atrocious, or cruel aggravating circumstance. Mr. Cook testified that in order to close the jaw and mouth of the victim, he had to rotate the victim's head and break the jaw. The prosecutor

sought to introduce this testimony as evidence tending to show that when rigor mortis set in, the victim's jaw was open because an object had been stuffed in his mouth. After defense counsel objected to the line of questioning, the trial court ruled that it would allow the evidence if the prosecutor could lay a foundation establishing that Mr. Cook was qualified to testify to such injuries. The prosecutor continued his questioning of Mr. Cook, who testified that the bottom jaw was out of line and that there was bruising in that area of the body. The trial court then held another bench conference and inquired as to whether the prosecutor could re-call the coroner to testify and exclude the possibility that the misalignment and injuries to the jaw which Mr. Cook described had occurred during the autopsy. The prosecutor said he could not, at which point the trial court said it would not allow Mr. Cook's testimony into evidence, granted defendant's motion to strike, and instructed the jury to disregard the testimony.

Defendant argues that this repetitive testimony was so gruesome and inflammatory that withdrawal was insufficient to cure the prejudice to defendant. Defendant further contends that in closing arguments, the prosecutor argued to the jury that the victim had been gagged, causing the jurors to recall the graphic testimony regarding the victim's jaw and affecting their recommendation that defendant be sentenced to death. We disagree.

Our review of the record reveals that the trial court properly addressed defense counsel's objections to the testimony by requiring the prosecutor to provide additional evidence to establish the probative value of the testimony of Mr. Cook concerning the victim's jaw. When the prosecutor failed to do so, the trial court granted defendant's motion to strike the testimony. Ordinarily, when objectionable evidence is withdrawn, no error is committed. *State v. Adams*, 347 N.C. 48, 68, 490 S.E.2d 220, 230 (1997), *cert. denied,* —— U.S. ——, 139 L. Ed. 2d 878 (1998). Furthermore, the trial court instructed the jury to disregard the testimony, and we must presume that the jury followed the instructions. *See Call*, 349 N.C. at 420, 508 S.E.2d at 520. In addition, there was properly admitted evidence that the victim was bound and stabbed repeatedly and that many wounds were inflicted while he was still alive. This evidence alone would have been sufficient to support the especially heinous, atrocious, or cruel aggravating circumstance. We overrule this assignment of error.

[25] Defendant next contends that the trial court erred in the capital sentencing proceeding by admitting the testimony of Detective Larry

Baulding quoting Christine Needham, a robbery victim. During his investigation of the crime, Detective Baulding interviewed Ms. Needham, the clerk at a convenience store where defendant committed a robbery on 20 February 1995. Detective Baulding testified about Ms. Needham's description of how defendant had threatened her with a gun and forced her to give him money. Because he stipulated to the conviction and judgment for the robbery, defendant argues that the State was precluded from offering additional evidence about the crime. Defendant argues that this additional testimony, offered to support the (e)(3) aggravating circumstance that he had been convicted of a prior felony involving the use or threat of violence to the person, was hearsay and therefore inadmissable. Defendant contends that admission of this evidence was in violation of the Confrontation Clause of the Sixth Amendment and Article I of the North Carolina Constitution.

We have repeatedly stated that the Rules of Evidence do not apply in capital sentencing proceedings. N.C.G.S. § 8C-1, Rule 1101(b)(3) (1992). Therefore, a trial court has great discretion to admit any evidence relevant to sentencing. *State v. Warren,* 347 N.C. 309, 325, 492 S.E.2d 609, 618 (1997), *cert. denied,* —— U.S. ——, 140 L. Ed. 2d 818 (1998). Furthermore,

> The issue of the propriety of limiting the state in these circumstances to the introduction of the defendant's record has been settled in this jurisdiction. In *State v. McDougall,* 308 N.C. 1, 301 S.E.2d 308, *cert. denied,* 464 U.S. 865, 78 L. Ed. 2d 173 (1983), we reaffirmed the rule in *State v. Taylor,* 304 N.C. 249, 283 S.E.2d 761 (1981), *cert. denied,* 463 U.S. 1213, 77 L. Ed. 2d 1398 (1983), holding that the state may not be limited to the introduction of a record of prior conviction when attempting to prove a circumstance in aggravation, whether or not the defendant has stipulated to the record of conviction. In *McDougall* we noted "the state's duty [under N.C.G.S. § 15A-2000(c)(1)] to prove each aggravating circumstance beyond a reasonable doubt. . . . [T]he state cannot be deprived of an opportunity to carry its burden of proof by the use of competent, relevant evidence." 308 N.C. at 22, 301 S.E.2d at 321.

*State v. Green,* 321 N.C. 594, 611, 365 S.E.2d 587, 597, *cert. denied,* 488 U.S. 900, 102 L. Ed. 2d 235 (1988) (alteration in original).

> The testimony in question here was the robbery victim's description of the manner in which the crime took place. We find this to be

relevant evidence of the (e)(3) aggravating circumstance. We conclude that the trial court did not err by admitting this evidence and thus overrule this assignment of error.

[26] In arguing his next two assignments of error together, defendant contends that during closing arguments at the capital sentencing proceeding, the trial court improperly prevented defense counsel from arguing to the jury that the ultimate decision as to the sentence recommendation was the individual responsibility of each juror, thereby improperly limiting the scope and content of defense counsel's arguments. Defendant argues that this was in violation of several of his rights under federal and state constitutional provisions. This supervision of closing arguments was within the discretion of the trial court. *See State v. Whiteside*, 325 N.C. 389, 398, 383 S.E.2d 911, 916 (1989). We find no abuse of discretion and no prejudice to defendant and overrule these assignments of error.

[27] Defendant next contends, based on three assignments of error, that during the capital sentencing proceeding, the trial court allowed the prosecutor to make arguments that were inflammatory, improper, and prejudicial, in violation of several of his rights under federal and state constitutional provisions. This Court has firmly established that "[t]rial counsel are granted wide latitude in the scope of jury argument, and control of closing arguments is in the discretion of the trial court." *State v. Soyars*, 332 N.C. 47, 60, 418 S.E.2d 480, 487 (1992). These principles apply not only to ordinary jury arguments, but also to arguments made in capital sentencing proceedings, and the boundaries for jury argument at the capital sentencing proceeding are more expansive than at the guilt phase. *State v. Bishop*, 343 N.C. 518, 552, 472 S.E.2d 842, 860 (1996), *cert. denied*, 519 U.S. 1097, 136 L. Ed. 2d 723 (1997). Further, "[p]rosecutors have a duty to advocate zealously that the facts in evidence warrant imposition of the death penalty." *State v. Williams*, 350 N.C. 1, 25, 510 S.E.2d 626, 642 (1999). We now apply the foregoing principles to each of defendant's contentions in turn.

[28] First, the prosecutor stated to the jury that in order for the mitigating circumstances to have value to weigh against the aggravating circumstances, they had to "justify," "excuse," or "offset" the first-degree murder. Defendant argues that this is a misstatement of the law. Defendant did not object to this argument at trial and asks this Court to review it for plain error. However, as the State notes, this is an incorrect standard of review. Where there has been no objection

during argument, the proper standard of review is whether the argument was so grossly improper as to require the trial court to intervene *ex mero motu*. *State v. Trull*, 349 N.C. 428, 451, 509 S.E.2d 178, 193 (1998).

[29] The prosecutor's arguments complained of here were an attempt to minimize the value of the mitigating circumstances. *See State v. Billings*, 348 N.C. 169, 186-87, 500 S.E.2d 423, 434, *cert. denied*, —— U.S. ——, 142 L. Ed. 2d 431 (1998). We have previously addressed this argument and stated that " 'prosecutors may legitimately attempt to deprecate or belittle the significance of mitigating circumstances.' " *Id.* at 186-87, 500 S.E.2d at 433-34 (quoting *State v. Basden*, 339 N.C. 288, 305, 451 S.E.2d 238, 247 (1994), *cert. denied*, 515 U.S. 1152, 132 L. Ed. 2d 845 (1995)). We conclude that this unobjected to argument did not amount to gross impropriety requiring intervention by the trial court on its own motion.

[30] Next, defendant complains about the prosecutor's comment that "[defendant] is a cold-blooded, arrogant killer, who would take your life and my life." Defendant argues that this characterization of him was based on the personal views and opinions of the prosecutor and that it prejudiced and inflamed the jury against defendant by naming him as their "potential and willing killer." The trial court overruled defendant's objection to this argument.

While we have held that it is improper for counsel to inject their personal beliefs into jury arguments, it is well settled that in argument to the jury counsel may argue all of the evidence and the reasonable inferences that arise therefrom. *See Williams*, 350 N.C. at 28, 510 S.E.2d at 644. Defendant is entitled to relief here only if the argument which was objected to " 'so infected the trial with unfairness' " as to deny defendant due process of law. *State v. McCollum*, 334 N.C. 208, 224, 433 S.E.2d 144, 152 (1993) (quoting *Darden v. Wainwright*, 477 U.S. 168, 181, 91 L. Ed. 2d 144, 157 (1986)), *cert. denied*, 512 U.S. 1254, 129 L. Ed. 2d 895 (1994). We have often emphasized that "[a] conviction based on the theory of premeditation and deliberation indicates a more calculated and cold-blooded crime." *State v. Davis*, 340 N.C. 1, 31, 455 S.E.2d 627, 643, *cert. denied*, 516 U.S. 846, 133 L. Ed. 2d 83 (1995). Considering the evidence of the brutality of the premeditated and deliberated murder committed by defendant here, the argument of the prosecutor drew reasonable inferences from the evidence and was not improper. *See State v. Rouse*, 339 N.C. 59, 92, 451 S.E.2d 543, 561 (1994) (defendant was characterized as a

"maniac," a "mean, cold-blooded killer," and a "violent killer"), *cert. denied*, 516 U.S. 832, 133 L. Ed. 2d 60 (1995). Further, as to the phrase that defendant would "take your life and my life," the State suggests, and we agree, that it was "no more than a figure of speech for this defendant's willingness to murder a stranger for money." We conclude that this argument did not exceed the broad bounds allowed in closing arguments at the capital sentencing proceeding.

**[31]** Finally, defendant complains of the following portion of the prosecutor's argument:

> [PROSECUTOR]: [I]f you impose life imprisonment . . . the State will do everything they can to make sure he stays in prison for the rest of his life, but, ladies and gentlemen of the jury, nothing is final—
>
> [DEFENSE COUNSEL]: Objection. Move to strike.
>
> THE COURT: Overruled at this time.
>
> . . . .
>
> [PROSECUTOR]: We submit and contend to you, ladies and gentlemen of the jury, the only way you can make sure that there is not another Ms. Blue that there is not another Mr. Tuttle, that this man does not assault, rob, and kill someone else,—
>
> [DEFENSE COUNSEL]: Objection.
>
> THE COURT: Overruled.
>
> [PROSECUTOR]: —is to impose the death penalty in this case. Nothing is final but death. Nothing is irrevocable but death.

Defendant contends that the prosecutor implied that defendant might be paroled if sentenced to life. We disagree. We find that this argument was not addressing parole, but was an argument that only the death penalty would deter defendant from committing future crimes. *See State v. Larry*, 345 N.C. 497, 528, 481 S.E.2d 907, 925 ("[I]f you don't give him death, he's going to get life. They are going to try and convince you that that's enough punishment in this case. That that will keep him locked away. . . . [T]he only way to be sure of it is to vote for the death penalty in this case."), *cert. denied*, —— U.S. ——, 139 L. Ed. 2d 234 (1997). We have consistently held, and defendant concedes, that the specific deterrence argument is permissible. *Id.*; *see also Williams*, 350 N.C. at 28, 510 S.E.2d at 644. For the reasons stated, defendant's assignments of error with regard to the

prosecutor's arguments during the capital sentencing proceeding are overruled.

Defendant next argues that the submission to the jury of the (e)(5) aggravating circumstance that the murder was committed during the commission of a burglary, robbery with a dangerous weapon, or kidnapping, without an instruction to the jury to consider this circumstance separately from their earlier determination of defendant's guilt was error. Defendant failed to properly preserve this alleged error by objecting to it at trial or by specifically and distinctly arguing on appeal that it was plain error and has therefore waived appellate review of this issue. N.C. R. App. P. 10(c)(4); *see also Call*, 349 N.C. at 402, 508 S.E.2d 509. Accordingly, this assignment of error is dismissed.

By another assignment of error, defendant contends that the trial court erred in admitting the testimony of Donna Reich, who testified that defendant had threatened her with a gun and stolen her purse. As he argued earlier, defendant again contends that because he stipulated to his convictions and the judgments for prior felonies, the State was precluded from introducing any additional evidence to prove the (e)(3) aggravating circumstance that defendant had committed a prior felony involving the use or threat of violence to the person. For the same reasons stated above, we again find no error.

In another assignment of error, defendant contends that the submission of kidnapping as an aggravating circumstance was improper, entitling him to a new trial. Defendant again argues that the "failure to release the victim in a safe place" element, which elevates the crime of kidnapping to first-degree, was not established by the State because the victim had not been removed from his residence and was killed in his own kitchen. Defendant presented this same argument earlier with regard to the guilt phase of the trial. For the reasons we have given in rejecting that earlier argument, we find no error. This assignment of error is overruled.

## PRESERVATION ISSUES

Defendant raises nine additional issues which he concedes have been decided contrary to his position previously by this Court: (1) the trial court erred by instructing the jury that if it answered "yes" to sentencing Issue Three on the verdict form used in capital sentencing proceedings, it would be the jury's duty to recommend death; (2) the

trial court erred by its use of the word "may" in sentencing Issues Three and Four; (3) the trial court erred in denying his motion to declare the death penalty unconstitutional; (4) the trial court erred in defining the burden of proof applicable to mitigating circumstances by use of the words "satisfy" and "satisfaction"; (5) the trial court erred by placing on defendant the burden of proving the existence of each mitigating circumstance by a preponderance of the evidence; (6) the trial court erred in instructing on the aggravating circumstance that the murder was especially "heinous, atrocious, or cruel," as this circumstance is unconstitutionally vague; (7) the trial court erred by instructing the jury that it must render a unanimous verdict in the penalty phase; (8) the trial court erred in denying defendant's motion to prohibit death qualification of jurors and in denying defendant's motion for individual *voir dire*; and (9) the trial court erred in preventing defense counsel from arguing "residual doubt" to the jury during their closing arguments.

Defendant raises these issues for purposes of permitting this Court to reexamine its prior holdings and also for the purpose of preserving them for any possible further judicial review. We have considered defendant's arguments on these issues and find no compelling reason to depart from our prior holdings. These assignments of error are overruled.

## PROPORTIONALITY REVIEW

[32] Having concluded that defendant's trial and separate capital sentencing proceeding were free of prejudicial error, it is now our duty to ascertain: (1) whether the record supports the jury's finding of the aggravating circumstances on which the sentence of death was based; (2) whether the death sentence was entered under the influence of passion, prejudice, or other arbitrary factor; and (3) whether the death sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. N.C.G.S. § 15A-2000(d)(2) (1997). After a thorough review of the transcript, record on appeal, and briefs in the present case, we are convinced that the jury's findings of the three aggravating circumstances submitted are supported by the evidence. Further, we find no indication that the sentence of death in this case was imposed under the influence of passion, prejudice, or any other arbitrary factor. We must turn then to our final statutory duty of proportionality review.

Defendant was convicted of first-degree murder on the basis of premeditation and deliberation and under the felony murder rule. He

was also convicted of first-degree burglary, robbery with a dangerous weapon, and first-degree kidnapping. Following a capital sentencing proceeding, the jury found the three submitted aggravating circumstances: (1) that defendant had been previously convicted of a felony involving the use or threat of violence to the person, N.C.G.S. § 15A-200(e)(3); (2) that this murder was committed while defendant was engaged in the commission of a robbery, burglary, or kidnapping, N.C.G.S. § 15A-2000(e)(5); and (3) that this murder was especially heinous, atrocious, or cruel, N.C.G.S. § 15A-2000(e)(9). Of the thirteen mitigating circumstances submitted, the jury found four to exist and have mitigating value.

We begin our proportionality analysis by comparing this case to those cases in which this Court has determined the death penalty to be disproportionate. "One purpose of proportionality review 'is to eliminate the possibility that a person will be sentenced to die by the action of an aberrant jury.'" *State v.* Atkins, 349 N.C. 62, 114, 505 S.E.2d 97, 129 (1998) (quoting *State v. Holden*, 321 N.C. 125, 164-65, 362 S.E.2d 513, 537 (1987), *cert. denied*, 486 U.S. 1061, 100 L. Ed. 2d 935 (1988)). This Court has determined the death sentence to be disproportionate on seven occasions. *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988); *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds by State v. Gaines*, 345 N.C. 647, 483 S.E.2d 396, *cert. denied*, —— U.S. ——, 139 L. Ed. 2d 177 (1997), *and by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988); *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983); *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983). We conclude that this case is not substantially similar to any case in which this Court has found the death penalty disproportionate.

This case has several features which distinguish it from the cases in which we have found the death sentence to be disproportionate. First, the jury found defendant guilty of first-degree murder under theories of both premeditation and deliberation and felony murder. We have noted the significance of a first-degree murder conviction based upon both premeditation and deliberation and felony murder theories. *See State v. Harris*, 338 N.C. 129, 161, 449 S.E.2d 371, 387 (1994), *cert. denied*, 514 U.S. 1100, 131 L. Ed. 2d 752 (1995). Second, evidence tended to show that the victim was brutally stabbed in his own home. This Court has consistently emphasized that murder committed in the home particularly " 'shocks the conscience' "

because such murders involve the violation of " 'an especially private place, one [where] a person has a right to feel secure.' " *Adams*, 347 N.C. at 77, 490 S.E.2d at 236 (quoting *State v. Brown*, 320 N.C. 179, 231, 358 S.E.2d 1, 34, *cert. denied*, 484 U.S. 970, 98 L. Ed. 2d 406 (1987)) (alteration in original). Further, the evidence tended to show that defendant repeatedly stabbed the victim while he was bound and helpless, and while he was still conscious. Moreover, in none of the cases in which the death penalty was found to be disproportionate was the (e)(3) aggravating circumstance found. *State v. Lyons*, 343 N.C. 1, 27-28, 468 S.E.2d 204, 217, *cert. denied*, —— U.S. ——, 136 L. Ed. 2d 167 (1996). "The jury's finding of the prior conviction of a violent felony aggravating circumstance is significant in finding a death sentence proportionate." *Id.* at 27, 468 S.E.2d at 217.

We also compare this case with the cases in which this Court has found the death penalty to be proportionate. While we review all of the cases in the pool of "similar cases" when engaging in our statutorily mandated duty, we have stated previously, and we reemphasize here, that we will not undertake to discuss or cite all of these cases each time we carry out that duty. *State v. Williams*, 308 N.C. 47, 81, 301 S.E.2d 335, 356, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 177 (1983). It suffices to say we conclude that this case is more similar to certain cases in which we have found the sentence of death proportionate than to those in which we have found the sentence of death disproportionate. Thus, based upon the characteristics of this defendant and the crime he committed, we are convinced the sentence of death was neither excessive nor disproportionate.

We therefore conclude that defendant received a fair trial and capital sentencing proceeding, free of prejudicial error, and that the judgment of death recommended by the jury and entered by the trial court must be left undisturbed.

NO ERROR.